Alan Harris (SBN 146079)
Priya Mohan (SBN 228984)
HARRIS & RUBLE
4771 Cromwell Avenue
Los Angeles, California 90027
Telephone: 323.962.3777
Facsimile: 323.962.3004
aharris@harrisandruble.com
pmohan@harrisandruble.com

David S. Harris (SBN 215224)
NORTH BAY LAW GROUP
116 E. Blithedale Ave., Ste. 2
Mill Valley, California 94941-2024
Telephone: 415.388.8788
Facsimile: 415.388.8770
dsh@northbaylawgroup.com

James Rush (SBN 240284)
LAW OFFICES OF JAMES D. RUSH
7665 Redwood Blvd., Ste. 200
Novato, California 94945-1405
Telephone: 415.897.4801
Facsimile: 415.897.5316
jr@rushlawoffices.com

Attorneys for Plaintiffs
Nicola Covillo, Troyreac Henry
and John Chisholm

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLA COVILLO, TROYREAC HENRY, and JOHN CHISHOLM, individually and on behalf of all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>SPECIALTY'S CAFE AND BAKERY, INC., a corporation, and CRAIG SAXTON, an individual,<br><br>　　　　　　　Defendants. | Case No. 11-CV-00594-DMR<br>*Assigned to Hon. Donna M. Ryu*<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS-ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br> Date:  February 27, 2014<br>Time: 11:00 a.m.<br>Courtroom: 4, 3rd Floor<br>　　　　　1301 Clay Street<br>　　　　　Oakland, CA 94612 |

**PLEASE TAKE NOTICE** that, on February 27, 2014, at 11:00 a.m., in Courtroom 4 of the above-entitled Court located in Oakland, California—or at such other date, time or place as the Court may designate—Plaintiffs will move pursuant to Federal Rule of Civil Procedure 23(e) for an order granting final approval of the class-wide Settlement Agreement and Amendment to Settlement Agreement ("Settlement Agreement") reached in the above-captioned action.  The Settlement Agreement was preliminarily approved—and the Settlement Class defined therein was conditionally certified—on October 24, 2013.

The Motion will be made and based upon this Notice; the Memorandum of Points and Authorities appended hereto; the Declarations of Alan Harris, Kathleen Wyatt, Plaintiffs Nicola Covillo, Troyreac Henry, and John Chisholm filed herewith; all of the pleadings, papers, and documents contained in the file of the within action; and such further evidence and argument as may be presented at or before the hearing on the Motion.

The Motion is made pursuant to the October 24, 2013, Order granting preliminary approval, as well as pursuant to the Court-approved Class Notice disseminated on November 22, 2013.

Dated:  January 23, 2014                    Respectfully submitted,

HARRIS & RUBLE

                    /s/ *Alan Harris*
                    Alan Harris
                    Priya Mohan


NORTH BAY LAW GROUP

                    /s/ *David S. Harris*
                    David S. Harris



LAW OFFICES OF JAMES D. RUSH

                    /s/ *James D. Rush*
                    James D. Rush
                    *Attorneys for Plaintiffs*

# TABLE OF CONTENTS

I.    Introduction ........................................................................................................ 1

II.   Summary of the Claims and of the Relevant Procedural History .......................... 2

    A.   The Initial Complaint and the Execution of the Settlement Agreement ............... 2

    B.   The Second Amended Complaint ......................................................................... 4

III.  Summary of the Settlement Agreement and Proposed Distribution ....................... 4

    A.   Weekend "Bread Pull" Subclass Reporting Time Violations ............................... 5

        1.   California Law Regarding Reporting Time ..................................... 5

        2.   Specialty's Weekend "Bread Pull" Subclass Violations ........................... 6

        3.   Damages and Distribution of Settlement Funds ................................. 6

    B.   "Tip Pool" Subclass Violations ......................................................................... 7

        1.   California Law Regarding Distribution of Tips .................................. 7

        2.   Specialty's "Tip Pool" Subclass Violations .................................... 7

        3.   Damages and Distribution of Settlement Funds ................................. 7

    C.   Drivers' "Delivery" Subclass Unreimbursed Expenses ......................................... 8

        1.   California Law Regarding Employee Expenses ................................ 8

        2.   Specialty's Expense Reimbursement Violations ............................. 8

        3.   Damages and Distribution of Settlement Funds ................................. 8

    D.   Improper "Overtime" Subclass Payments ......................................................... 9

        1.   The Law Regarding Overtime ...................................................... 9

        2.   Specialty's Overtime Violations ................................................ 10

        3.   Damages and Distribution of Settlement Funds ............................... 10

    E.   Meal And Rest Period Violations .................................................................... 11

        1.   The Law Regarding Meal and Rest Breaks .................................. 11

        2.   Specialty's Meal and Rest Break Violations ................................ 11

        3.   Damages and Distribution of Settlement Funds ............................... 12

    F.   Derivative Wage and Hour Claims .................................................................. 13

    G.   PAGA Claims .............................................................................................. 14

IV.   Incentive Awards and Attorney's Fees .............................................................. 15

V.    Notice to the Class .......................................................................................... 17

VI.   Release Provisions and Opting Out .................................................................. 19

VII.  The Court Should Certify the Class and Approve the Settlement Agreement ............... 19

    A.   Class Certification is Warranted ..................................................................... 19

    B.   The Settlement Meets the Requirements for Final Approval .............................. 21

        i.   Settlement Negotiations were Conducted at Arm's Length ................... 22

i

ii.     Other Factors......................................................................................... 22

a.     *The Strength of Plaintiffs' Case* ............................................................. 23

b.     *The Likely Duration of Further Litigation* ............................................. 23

VIII.    Conclusion ....................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

Adames v. Mitsubishi Bank, Ltd.,
   133 F.R.D. 82 (E.D.N.Y. 1989) ............................................................................ 20

Boeing Co. v. Van Germet,
   444 U.S. 472 (1980) ............................................................................................ 16

Campbell v. First Investors Corp.,,
   2012 U.S. Dist. LEXIS 155549 (S.D. Cal. filed Oct. 29, 2012) ........................ 16

Cortez v. Purolator Air Filtration Prods. Co.,
   23 Cal. 4th 163 (2000) ....................................................................................... 14

Covillo v. Specialty's Cafe,
   2013 WL 5781574 (N.D. Cal. filed Oct. 25, 2013) .......................................... 17

Dunleavy v. Nadler,,
   213 F.3d 454 (9th Cir. 2000) ........................................................................ 19, 23

Etheridge v. Reins Int'l California, Inc.,
   172 Cal. App. 4th 908 (2009) .............................................................................. 7

Garcia v. Bana,,
   2013 U.S. Dist. LEXIS 22415 (N.D. Cal. filed Feb. 19, 2013) .......................... 4

Gonzalez v. Millard Mall Servs.,,
   2012 U.S. Dist. LEXIS 118133 (S.D. Cal. filed Aug. 21, 2012) ........................ 4

Hanlon v. Chrysler Corp.,
   150 F.3d 1011 (9th Cir. 1998) .......................................................................... 23

Harris v. Investors' Business Daily, Inc.,
   138 Cal. App. 4th 28 (2006) .............................................................................. 14

Helm v. Alderwoods Group, Inc.,
   2011 WL 5573837 (N.D. Cal. filed Nov. 15, 2011) ........................................ 24

Hopkins v. Stryker Sales Corp.,
   2013 WL 496358 (N.D. Cal. filed Feb. 6, 2013) ............................................. 16

Huntington Mem'l Hosp. v. Superior Court,
   131 Cal. App. 4th 893 (2005) .............................................................................. 9

In re NASDAQ Market-Makers Antitrust Litig.,
   187 F.R.D. 465 (S.D.N.Y. 1998) .................................................................. 23, 24

In re Warfarin Sodium Antitrust Litig.,
   212 F.R.D. 231 (D. Del. 2002) ......................................................................... 24

Int'l Union v. Gen. Motors Corp.,
   497 F.3d 615 (6th Cir. 2007) ............................................................................ 18

Jones v. Spherion Staffing LLC,
   2012 WL 3264081 (C.D. Cal. filed Aug. 7, 2012) .......................................... 23

Khanna v. Inter-Con Sec. Sys., Inc.,,
   2012 U.S. Dist. LEXIS 137651 (E.D. Cal. filed Sept. 25, 2012) ..................... 19

Labbate-D'Alauro v. GC Servs. Ltd. P'ship,
   168 F.R.D. 451 (E.D.N.Y. 1996) ..................................................................... 20

Linney v. Cellular Alaska P'ship,
   151 F.3d 1234 (9th Cir. 1998) .......................................................................... 19

iii

PLS.' MOT. FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEM. OF P'S. AND A'S. IN SUPP.

Linney v. Cellular Alaska P'ship,
    1997 WL 450064  (N.D. Cal. filed July 18, 1997) .............................................. 22

McKenzie v. Fed. Express Corp.,
    2012 WL 2930201  (C.D. Cal. filed July 2, 2012)........................................ 21, 22

Nat'l. Rural Telecomm. Coop. v. DIRECTV, Inc.,
    221 F.R.D. 523 (C.D. Cal. 2004) ..................................................................... 23

Ochoa–Hernandez v. Cjaders Foods, Inc.,
    2010 WL 1340777 (N.D. Cal. filed Apr. 2, 2010).............................................. 4

Officers for Justice v. Civil Serv. Comm.,
    688 F.2d 615 (9th Cir. 1982), ........................................................................... 19

Ordonez v. Radio Shack, Inc.,,
    2013 U.S. Dist. LEXIS 7868  (C.D. Cal. filed Jan. 17, 2013) ........................... 24

Partlow v. Jewish Orphans' Home, Inc.,
    645 F.2d 757 (9th Cir. 1981) .............................................................................. 5

Rodriguez v. Disner,
    688 F.3d 645 (9th Cir. 2012) ............................................................................ 15

Rodriguez v. West Publ'g Corp.,
    563 F.3d 948 (9th Cir. 2009) ....................................................... 13, 15, 23, 24

Singer v. Becton Dickinson & Co.,
    2010 WL 2196104 (S.D. Cal. filed June 1, 2010) ............................................ 17

Smith v. CRST Van Expedited, Inc.,,
    2013 U.S. Dist. LEXIS 6049 (S.D. Cal. filed Jan. 14, 2013) ..................... 15, 16

Brinker Restaurant Corp. v. Superior Court,
    53 Cal. 4th 1004 (2012) .................................................................................... 22

Tompkins v. C & S Wholesale Grocers, Inc.,,
    2012 U.S. Dist. LEXIS 24943 (E.D. Cal. filed Feb. 27, 2012)............................ 4

Torrisi v. Tucson Elec. Power Co.,
    8 F.3d 1370 (9th Cir. 1993) ........................................................................ 21, 23

Van Vranken v. Atl. Richfield Co.,
    901 F. Supp. 294 (N.D. Cal. 1995) ................................................................... 15

Vasquez v. Coast Valley Roofing, Inc.,
    266 F.R.D. 482 (E.D. Cal. 2010) ...................................................................... 16

White v. Starbucks Corp.,
    497 F.Supp.2d 1080 (N.D. Cal. 2007) .............................................................. 13

Wren v. RGIS Inventory Specialists,
    2011 WL 1230826  (N.D. Cal. filed Apr. 1, 2011)...................................... 22, 24

**STATUTES**

29 U.S.C. § 201 *et seq.*...............................................................................3, 14

29 U.S.C. § 207(a) .............................................................................................. 9

29 U.S.C. § 216(b) .............................................................................................. 3

29 U.S.C. § 255(a) .............................................................................................. 5

29 U.S.C. § 256(b) .............................................................................................. 5

Ca. Bus. & Prof. Code § 17200 *et seq.* .....................................................3, 4, 14

Cal. Bus. & Prof. Code § 17203 ....................................................................... 14

Cal. Bus. & Prof. Code § 17208 ................................................................. 4

Cal. Lab. Code § 201 .............................................................................. 14

Cal. Lab. Code § 201(a) ......................................................................... 14

Cal. Lab. Code § 202 .............................................................................. 14

Cal. Lab. Code § 203 ...................................................................... 3, 13, 14

Cal. Lab. Code § 203(a) ......................................................................... 14

Cal. Lab. Code § 203(b) ........................................................................... 4

Cal. Lab. Code § 218.5 ........................................................................... 16

Cal. Lab. Code § 221 ............................................................................... 3

Cal. Lab. Code § 226 ......................................................................... 3, 13

Cal. Lab. Code § 226(a) ......................................................................... 13

Cal. Lab. Code § 226(e) ......................................................................... 13

Cal. Lab. Code § 226.7 ................................................................. 3, 12, 13

Cal. Lab. Code § 226.7(b) ...................................................................... 11

Cal. Lab. Code § 338 ............................................................................... 4

Cal. Lab. Code § 510 ............................................................................... 2

Cal. Lab. Code § 510(a) ........................................................................... 9

Cal. Lab. Code § 512 ....................................................................... 3, 22

Cal. Lab. Code § 512(a) ......................................................................... 11

Cal. Lab. Code § 1174 ............................................................................. 3

Cal. Lab. Code § 1194 ...................................................................... 2, 16

Cal. Lab. Code § 2802 ....................................................................... 3, 8

Cal. Lab. Code § 2968 ..................................................................... 3, 14

Cal. Lab. Code § 2699(a) ....................................................................... 15

Cal. Lab. Code § 2699(i) ........................................................................ 15

**RULES**

Fed. R. Civ. P. Rule 23 ................................................................... passim

Fed. R. Civ. P. 23(a) .............................................................................. 20

Fed. R. Civ. P. 23(b) .............................................................................. 21

Fed. R. Civ. P. 23(b)(3) ......................................................................... 21

Fed. R. Civ. P. 23(c)(1) .......................................................................... 24

Fed. R. Civ. P. 23(c)(2)(B) ..................................................................... 18

Fed. R. Civ. P. 23(c)(3) .......................................................................... 18

Fed. R. Civ. P. 23(e) ........................................................................ 2, 21

**REGULATIONS**

29 C.F.R. §778.111(a) ............................................................................ 10

8 Cal. Code Regs. § 11050 subsec. 5(A) .................................................. 6

8 Cal. Code Regs. § 11050 subsec. 11(A) ...................................................................... 11

8 Cal. Code Regs. § 11050 subsec. 12(A) ...................................................................... 11

**OTHER AUTHORITIES**

4 Conte & Newberg, Newberg on Class Actions § 11:41 (4th ed. 2002) ................................... 25

4 Conte & Newberg, Newberg on Class Actions § 11:50 (4th ed. 2002) ................................... 23

PLS.' MOT. FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEM. OF P'S. AND A'S. IN SUPP.

## MEMORANDUM OF POINTS & AUTHORITIES

### I.     Introduction

The Parties have reached a settlement of the class and collective-action claims alleged in this case.[1]  The response of Class Members is overwhelmingly positive.  To date, Claims have been submitted by approximately one-third of the 3,623 persons to whom Notice was mailed, yet there are no objections to the settlement and no opt-outs.  (January 23, 2014, Declaration of Kathleen Wyatt, ¶4-5 and 10-11).[2]  Accordingly, Plaintiffs ask the Court to certify the Class and give final approval to the settlement.  The Settlement Agreement, as amended, requires Specialty's to pay $2,000,000 in cash. To date, Specialty's has timely deposited $1,030,000, with the balance due, later this year.   (See September 10, 2013, Decl. of Alan Harris in Supp. of Mot. for Preliminary Approval of Class-Action Settlement & Conditional Certification of Settlement Class.  ("Sept. 10, 2013, Harris Decl.") Ex. 1, ¶ 7).

After receiving the Court's instruction at the July 25, 2013 hearing on the Motion for Preliminary Approval, the Parties entered into an Amendment to the Settlement Agreement which addressed the Court's comments.  (Sept. 10, 2013, Harris Decl., Ex. 2.)  For purposes of the Settlement, Plaintiffs have simplified the structure they initially proposed for approval, with five subclasses to receive distribution of the Gross Settlement Fund.  The following is the proposed structure for the overall distribution:

| | |
|---|---:|
| Claims Administration (Gilardi) | $  50,000[3] |
| Attorneys' Fees` | 660,000 |
| Attorneys' Costs | 50,000 |
| Plaintiffs' Incentive Awards | 24,000 |
| Estimated Payroll Taxes | 77,000 |
| Bread Pull Subclass | 40,000 |
| Tip Pool Subclass | 35,000 |
| Delivery Subclass | 70,000 |
| Overtime Subclass | 80,000 |
| Meal and Rest Break Subclass | 914,000 |
| Total | $  2,000,000 |

---

[1] Capitalized terms herein are the same as those used in the Settlement Agreement.

[2] Since the final postmark day for Claims was January 21, 2014, and the final day for submission of objections is February 3, 2014, Plaintiffs will shortly supplement this filing to advise this Court of the final numbers.  Further, due to re-mailing of Claim Forms to those for whom the defense had stale addresses, some Claims are due after February 3, 2014.  (Jan. 23, 2014 Wyatt Decl., ¶¶6-7).  However, at this stage the overwhelming bulk of the Claims have been submitted and reviewed and the analysis in this submission indicates that this case should now be brought to closure, with this Court's formal, final approval of the Settlement Agreement.

[3] These costs are presently at $45,000, and the balance of $5,000 should pour over to the benefit of the Meal and Rest Break Subclass.

All told, the proposed distribution is an outstanding result for the employees, achieved after three

lengthy mediation sessions and upon the parties' acceptance of a Mediator's proposal for settlement.

(Sept. 10, 2013, Harris Decl. ¶¶ 48-50.) The Settlement Agreement should receive Final Approval.

Since the Gross Settlement Fund will receive payments from the Defendant in both 2013 and

2014, the Parties proposed a two-step distribution to the Class Members, as follows:

**Payments on or about January 1, 2014:**
- Bread Pull Subclass payment:                               $40,000
- Tip Pool Subclass payment:                                $35,000
- Delivery Subclass payment:                                $70,000
- Overtime Subclass payment:                                $80,000
- Meal and Rest Break (payment 1 of 2):        $329,000[4]
- Payroll Taxes (approximate):                              $34,000
- Claims Administration Fees (maximum):              $50,000
- One-half of Court awarded Enhancement awards:     $12,000
- Court awarded Attorney costs:                            $55,000
- One-half of Court awarded attorneys' fees:        $330,000
                      **Total of First Distribution:**    **$1,030,000**

**Payments on or about November 15, 2014:**
- Meal and Rest Break (payment 2 of 2):                 $585,000
- Payroll Taxes (approximate):                              $43,000
- One-half of Court awarded enhancement awards:    $12,000
- One-half of Court awarded attorneys' fees:       $330,000

                **Total of Second Distribution**    **$970,000**

In addition, after Final Approval, Specialty's will be subject to injunctive relief, requiring it to

provide refresher training to Store General Managers; to confirm that it is routinely maintaining precise

records of the actual hours worked by its employees; and to use the correct regular rate when computing

overtime for its employees. (Sept. 10, 2013, Harris Decl., Ex. 1, ¶8).  All costs incurred in connection

with the injunctive relief will be borne by Specialty's, in addition to the nonrefundable $2,000,000 cash

payment to the Gross Settlement Fund.  (Sept. 10, 2013, Harris Decl., ¶ 56).

## II.     Summary of the Claims and of the Relevant Procedural History

### A.     The Initial Complaint and the Execution of the Settlement Agreement

Plaintiffs Covillo and Henry commenced this action on February 9, 2011.  By way of the

operative Second Amended Complaint ("SAC"), Plaintiffs assert causes of action for all of the

following:  Failure to Pay Minimum Wage and Overtime Compensation, (Ca. Lab. Code §§ 510 and

---

[4] As it appears all amounts set aside for the Bread Pull, Tip Pool and Delivery Subclasses will not be claimed, additional funds will be distributed pro rata to the Meal and Rest Break Subclass.

1  1194), Continuing Wages (Ca. Lab. Code § 203),  Failure to Provide Accurate Itemized Wage

2  Statements (Ca. Lab. Code § 226), Failure to Maintain Accurate Payroll Records (Ca. Lab. Code

3  §1174),  Failure to Provide Adequate Rest Periods (Ca. Lab. Code §§ 226.7, 512, and IWC Wage Order

4  5), Failure to Provide Adequate Meal Periods (Ca. Lab. Code §§ 226.7, 512 and IWC Wage Order 5),

5  Improper Deductions from Wages (Ca. Lab. Code § 221), Conversion – Employer Taking Gratuities,

6  Failure to Reimburse Business Expenses (Ca. Lab. Code § 2802), Failure to Pay Minimum Wage and

7  Overtime Compensation (Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*), Restitution and

8  Injunctive Relief (Ca. Bus. and Prof. Code §§ 17200 *et seq.*) and Civil Penalties (Ca. Lab. Code § 2968).

9  Plaintiffs brought this case as a class action, a collective action under the FLSA, 29 U.S.C. § 216(b), and

10  one to secure civil penalties under the California Labor Code Private Attorneys General Act ("PAGA").

11  By the end of the class period, Specialty's operated more than 30 retail stores throughout the

12  State of California.  Specialty's retail locations are perhaps best described as quick service bakery-cafés,

13  serving its customers breakfast, sandwiches, salads, baked goods, soups and various beverages.  At its

14  locations, Specialty's employs bakers, baristas, sales managers and associates, catering managers and

15  associates, drivers, cooks and dishwashers.  Specialty's customers can either come into a café to order

16  and eat their food, or alternatively, catering orders can be placed and delivered to the customer's office

17  by Specialty's delivery drivers.  Specialty's is a privately held, "start-up" company run in a typically

18  entrepreneurial style.  As such, it is understandable that Specialty's violated various wage and hour laws

19  that it was required to follow.  However, there is no evidence that Defendant Saxton or Specialty's acted

20  in a venal fashion *vis-à-vis* its employees.  To the contrary, all employees appear to have been paid in

21  excess of prevailing industry standards for similar work.  (Sept. 10, 2013, Harris Decl. ¶ 56.)

22  Specialty's employed Plaintiff Covillo as a Team Lead at a Specialty's store located in San

23  Francisco between July 2006 through September 2007.  Commencing in October of 2007, Defendant

24  employed Plaintiff Henry as a customer service associate.  She was promoted to a team lead at a

25  Specialty's store located in San Francisco and later, at a store located in Oakland, leaving in October of

26  2009.  Ms. Henry had short stints at three additional stores, working at five locations in total.  Plaintiff

27  Chisholm worked for Specialty's in San Francisco as a delivery driver from January through July 2011.

28  (Sept. 10, 2013, Harris Decl. ¶¶ 40-42.)

After engaging in significant written discovery involving the exchange of over 30,000 documents, six depositions, as well as significant motion practice, the parties agreed to participate in a third mediation, this final effort before Steven Rottman, an experienced wage-and-hour mediator (see Sept. 10, 2013, Harris Decl. ¶¶ 44, 50).  An initial full-day mediation session with Mr. Rottman was held on December 19, 2012.  Although significant progress was made during that session, the parties were unable to reach an agreement resolving this case.  On January 8, 2013, Mr. Rottman made a rather complex mediator's proposal for resolution of this case, which proposal, with minor changes, was ultimately accepted by the parties as a basis for resolution.  (Sept. 10, 2013, Harris Decl. ¶ 50.)  That Settlement Agreement as amended is the subject of the present Motion.

## B.    The Second Amended Complaint

The SAC added a PAGA civil-penalties claim under section 2698 *et seq.* of the Labor Code for the alleged violations.  (SAC, ¶¶ 129-132.)  Significantly, even in federal courts, the weight of authority holds that Rule 23 certification is not required for the PAGA claims.  Ochoa–Hernandez v. Cjaders Foods, Inc.*,* 2010 WL 1340777, at *4 (N.D. Cal. Apr.2, 2010) ("Unlike class actions . . . the action is fundamentally a law enforcement action.")

## III.   Summary of the Settlement Agreement and Proposed Distribution

The Class consists of all non-exempt individuals employed by Specialty's in California beginning on February 9, 2007.  (SAC ¶ 56.)  While the Business and Professions Code has a four-year statute of limitations, the FLSA has a two-year limitations period.[5]  Compare Cal. Bus. & Prof. Code

---

[5] Plaintiffs' Labor Code claims for overtime and missed breaks, which are subject to a three-year limitations period, see Cal. Lab. Code § 338 (adopting a three-year statute for "action[s] upon a liability created by statute), are subsumed by the Business and Professions Code's longer statutory period, see Tompkins v. C & S Wholesale Grocers, Inc., 2012 U.S. Dist. LEXIS 24943 at *11–12 (E.D. Cal. filed Feb. 27, 2012) (explaining that, because California's unfair-competition law "'admits of no exceptions,'" an overtime claim brought via section 17200 *et seq.* "'is subject to the four-year period of limitations created by . . . section [17208]'") (quoting Cortez, 23 Cal. 4th at 178–79).  The one-to-three-year statutory period for Plaintiffs' wage-statement claim, see Garcia v. Bana, 2013 U.S. Dist. LEXIS 22415 at *33–34 (N.D. Cal. filed Feb. 19, 2013) (explaining that claims under section 226 are subject to a one-year or three-year limitations period, depending on whether "actual" or "statutory" damages are sought), and the one-year statute for Plaintiffs' civil-penalties claim, see Gonzalez v. Millard Mall Servs., 2012 U.S. Dist. LEXIS 118133 at *7 (S.D. Cal. filed Aug. 21, 2012) (stating that LCPAGA claims are "subject to a one year statute of limitations), are likewise shorter than the four-year period under the unfair-competition law.  Similarly, Plaintiffs' claim for continuing wages is no longer than four years.  See Cal. Lab. Code § 203(b) (stating that "[s]uit may be filed for [continuing-wage] penalties at any time before the expiration of the statute on an action for the wages from which the penalties arise").

4

PLS.' MOT. FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEM. OF P'S. AND A'S. IN SUPP.

1   § 17208 (stating that "[a]ny action to enforce any cause of action pursuant to this chapter shall be

2   commenced within four years after the cause of action accrued") <u>with</u> 29 U.S.C. § 255(a) (stating that

3   any action for unpaid overtime "shall be forever barred unless commenced within two years after the

4   cause of action accrued").[6]

5       According to Defendants, there are approximately 3,600 Class Members.  Pursuant to the

6   Settlement Agreement and Amendment, Defendants will pay $2,000,000 in cash for the benefit of the

7   Class.  To date, approximately 1,200 persons have submitted Claims.  If this Court grants Final

8   Approval, the gross recovery will be about $1,666 per employee.  (Jan. 23, 2014, Harris Decl. ¶  .)  The

9   $2,000,000 Gross Settlement Payment constitutes the Gross Settlement Fund.  (Sept. 10, 2013, Harris

10  Decl. Ex. 1 at ¶ 7.)  The Gross Settlement Fund will be used to pay the costs of delivering the Class

11  Notice and the Claim Form to the Class, as well as to pay payroll taxes, attorney's fees and costs to

12  Class Counsel and enhancement awards to the named Plaintiffs, all subject to approval by the Court.

13  (Sept. 10, 2013, Harris Decl. Ex. 1 at ¶ 7A, B and C.)

14      After the above deductions have been made from the Gross Settlement Fund, the balance (the

15  "Net Settlement Fund") will be distributed to Class Members.  Defendants are not entitled to any

16  reversion. All money in the Net Settlement Fund will be distributed to Class Members.  All funds from

17  uncashed checks sent to claimants after the distribution based on the employee's claims will be

18  disbursed to the California Labor and Workforce Development Agency ("LWDA"), in recognition of

19  Plaintiffs' PAGA claim.  Below is a detailed discussion of the proposed distribution.

20      ***A.   Weekend "Bread Pull" Subclass Reporting Time Violations[7]***

21          ***1.   California Law Regarding Reporting Time***

22      The California Reporting Time requirement is set forth in Section 5 of the Wage Order, which

23  provides that each workday an employee is required to report for work and does report, but is not put to

24

25  [6] Although the FLSA adopts a longer, three-year statutory period for "willful" violations, <u>see</u> 29 U.S.C.
    § 255(a), the statute "continues to run until a valid consent [to join the action] is filed."  <u>Partlow v.</u>
26  <u>Jewish Orphans' Home, Inc.</u>, 645 F.2d 757, 760 (9th Cir. 1981) (citing 29 U.S.C. § 256(b)).  Because no
    Class Members have yet "opted in"—indeed, because notice will not be delivered to Class Members
27  until after the Settlement Agreement is preliminarily approved, presumably in July 2013—the March 15,
    2010, commencement date for FLSA liquidated damages effectively "reaches back" to cover the extra,
28  third year for the alleged FLSA violations.
    [7] This subclass is discussed in detail in the September 10, 2013 Harris Decl., ¶¶ 9-11.

PLS.' MOT. FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEM. OF P'S. AND A'S. IN SUPP.

1   work or is furnished less than half of that employee's usual or scheduled day's work, the employee shall

2   be paid for half the usual or scheduled day's work, but in no event for less than two hours of work.  8

3   Cal. Code Regs. § 11050 subsec. 5(A).

4                    **2.      Specialty's Weekend "Bread Pull" Subclass Violations**

5            For every Specialty's bakery store that is closed on weekends, it is required that one employee

6   come into the store on a weekend day in order to do a "bread pull." The process involves removing

7   bread from the freezer, so it might be ready for baking the next morning.  In many instances, these

8   employees did not punch in when they reported to work to pull the bread – they worked "off the clock."

9   In other instances, the employees only punched in for the short period of time that was required to pull

10  the bread, being paid for fewer than two hours.  Many times, the employee performed other tasks, and

11  worked for and was paid for more than two hours.

12          Both Plaintiffs Covillo and Henry were required to work on weekends and, at times, were either

13  uncompensated or not compensated for the minimum two hours required by the Labor Code.  (Henry

14  became a Team Lead on February 12, 2008, previously having served in the Customer Service capacity,

15  beginning on October 5, 2007).  Most stores required an employee to report on a weekend day to pull

16  bread from the freezer so it would be ready for baking on Monday morning.  Both Ms. Henry and Ms.

17  Covillo, as Team Leads, were required to perform these services, Ms. Henry at store 20 and store 501;

18  Ms. Covillo at store 20.  For example, on August 22 and 29, 2008, Ms. Henry worked without any pay at

19  store 501.  She did the same on September 14, 2008, at store 20.  Ms. Covillo worked at store 20 and

20  was compensated for less than the required reporting time pay on the following Sundays in 2007:

21  February 11, March 11, April 1, May 20, June 2 and July 22.  Ms. Henry worked for less than the

22  required reporting time pay, at each store.  (Sept. 10, 2013, Harris Decl. ¶ 11 n.2.)  The relevant, class-

23  wide information has been provided to the Claims Administrator, Claims have been filed and subjected

24  to preliminary analysis, and this subclass should be certified.  (Jan. 23, 2014 Wyatt Decl., ¶ 10.).

25                   **3.      Damages and Distribution of Settlement Funds**

26          Plaintiffs originally computed the possible total damages for unpaid "Bread Pull" wages to be

27  approximately $55,000.  Since it was improbable that all employees would participate, the limit for this

28  subclass was set at $40,000.  Each impacted employee is entitled to no more than two hours of pay for

each incident.  In light of an anticipated participation rate of approximately 50%, it was expected that all employees who submit Bread Pull claims will recover 100% of their unpaid reporting time wages, wages for at least two hours of work for each day on which they reported for work.  (Sept. 10, 2013, Harris Decl. ¶10.)  To date, of 410 employees in the Bread Pull Subclass, 193 have filed a claim.  Of the total 2,396.99 hours of unpaid wages the Claims represent 1,420.54 hours and payments of $18,035.08.  (Jan. 23, 2014 Wyatt Decl., ¶ 10.).  The proposed maximum allocation to this subclass was $40,000.  (Sept. 10, 2013, Harris Decl. ¶ 10.)  Since the settlement will pay 100% of the claims, the proposed resolution of this portion of the matter augurs in favor of approving the settlement, as the balance of over $20,000 will pour over to the Meal and Rest Break Subclass, for distribution to those Claimants.

### B.    "Tip Pool" Subclass Violations[8]

#### 1.    California Law Regarding Distribution of Tips

One may not divert a portion of a tip pool to company managers.  See Etheridge v. Reins Int'l California, Inc., 172 Cal. App. 4th 908, 921, n. 17 (2009).

#### 2.    Specialty's "Tip Pool" Subclass Violations

Until approximately September of 2008, Specialty's improperly provided just fewer than fifty Team Leads with a portion of the tips that should have been solely distributed to non-management employees.  But for the improper distribution of the tip pool to managers, the hourly workers would each have received at least an additional sum, estimated to be approximately than $.10 per hour worked.  (Sept. 10, 2013 Harris Decl., ¶¶ 12-14). The relevant, class-wide information has been provided to the Claims Administrator, Claims have been filed and subjected to preliminary analysis, and this subclass should be certified.  (Jan. 23, 2014 Wyatt Decl., ¶ 10.).

#### 3.    Damages and Distribution of Settlement Funds

Analysis has determined that the improper distribution of tips resulted in the lower level workers, such as Plaintiff Henry in 2007, being underpaid by approximately $.10 per hour.  For a full time worker, this would amount to an underpayment of less than $200 per year. The improper policy regarding distribution of tips was in effect from February 2007 through September 2008.  Analysis of the pay records indicated that the Tip Pool Subclass had 596 members.  Claims were filed by 225 Class

---

[8] This subclass is discussed in detail in the September 10, 2013 Harris Decl., ¶¶ 12-16.

Members.  Of the total 493,095.49 hours of work and possible payment of $49,310.01, the actual claims represent 240,591.77 hours of work and payment of $24,059.39. (Jan. 23, 2014 Wyatt Decl., ¶ 10.). The proposed maximum allocation to this subclass was $35,000.  (Sept. 10, 2013, Harris Decl. ¶ 15.)  Since the settlement will pay 100% of the claims, the proposed resolution of this portion of the matter augurs in favor of approving the settlement, as the balance of over $10,000 will pour over to the Meal and Rest Break Subclass, for distribution to those Claimants.

### C.    Drivers' "Delivery" Subclass Unreimbursed Expenses[9]

#### 1.    California Law Regarding Employee Expenses

Under Section 2802 of the California Labor Code, employees such as delivery drivers are entitled to reimbursement of 100% of their expenses.  Cal. Lab. Code § 2802.

#### 2.    Specialty's Expense Reimbursement Violations

Specialty's improperly failed to systematically reimburse drivers' mileage and parking expenses. Some employees had significant unreimbursed expenses.  Analysis indicates that most were reimbursed for all or a substantial part of their routine "mileage allowance" as dictated by the applicable IRS regulations.  See, e.g., http://www.irs.gov /pub/irs-drop/n-12-72.pdf (IRS Standard Mileage Rates for 2013) (accessed Sept. 10, 2013).  In particular, in certain instances Drivers' business-related expenses were reimbursed through the payment of a portion of the Delivery Fees, which were collected by the particular store for deliveries made to various customers.  In certain instances when Drivers were not entitled to receive Delivery Fees because their store had too many defective deliveries, Drivers, at times, were provided with mileage reimbursement based on the number of deliveries they completed during the pay period.  In some instances, however, Drivers received no payments and are thus entitled to be compensated for their delivery-related expenses associated with utilizing an employee-owned vehicle. The relevant, class-wide information has been provided to the Claims Administrator, Claims have been filed and subjected to preliminary analysis, and this subclass should be certified.  (Jan. 23, 2014 Wyatt Decl., ¶ 10.).

#### 3.   Damages and Distribution of Settlement Funds

Review of the matter indicates that some Drivers had unreimbursed parking and mileage

---

[9] This subclass is discussed in detail in the September 10, 2013 Harris Decl., ¶¶ 26-29.

8

PLS.' MOT. FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEM. OF P'S. AND A'S. IN SUPP.

1  expenses.  Expenses for any alleged automobile accidents are excluded from the proposed distribution,

2  along with unpaid traffic and parking tickets.  Under the proposed plan of distribution, drivers have been

3  permitted to claim a reasonable amount for unreimbursed expenses, and be made whole.  Analysis of the

4  pay records indicated that the Delivery Subclass had 159 members.  Claims have been filed by 63 Class

5  Members.  The projected cost for this part of the settlement is less than $70,000, which is the cap

6  amount for this subclass, after which pro rata distribution might come into effect.  (Sept. 10, 2013,

7  Harris Decl. ¶ 28.)  The proposed resolution of this portion of the matter augurs in favor of approving

8  the settlement, as the balance will pour over to the Meal and Rest Break Subclass, for distribution to

9  those Claimants.

10       **D.       Improper "Overtime" Subclass Payments[10]**

11            **1.       The Law Regarding Overtime**

12       Under state and federal law, one must use a "regular rate" when computing overtime which

13  includes all relevant payments made to employees during the pay period during which overtime is

14  earned.  Many Specialty's employees were entitled to both overtime earnings and "Delivery Fee"

15  payments relating to their efficiency during the same pay period.  These individuals were victims of

16  Specialty's improperly computing the applicable overtime rate without reference to these Delivery Fee

17  payments.

18       Under California law, "[a]ny work in excess of eight hours in one workday and any work in

19  excess of 40 hours in any one workweek . . . shall be compensated at the rate of no less than one and

20  one-half times the regular rate of pay for an employee." Cal. Lab. Code § 510(a).  A similar rule applies

21  under the FLSA.  See 29 U.S.C. § 207(a).  An employee's "regular rate," in turn, must be calculated

22  with reference to "*all* payments which the parties have agreed shall be received regularly during the

23  workweek, exclusive of overtime payment."  Huntington Mem'l Hosp. v. Superior Court, 131 Cal. App.

24  4th 893, 904 (2005) (emphasis supplied). This means Defendants' failure to include all required

25  elements in the computation of the regular rate violated the overtime laws. These payments *must* be

26  included in the regular-rate—and, therefore, in the overtime-rate computation.  See Division of Labor

27  Standards Enforcement, Enforcement Policies and Interpretations Manual § 49.1.1 (2002)(explaining

28

---
[10] This subclass is discussed in detail in the September 10, 2013 Harris Decl., ¶¶ 17-25.

1  that "[t]he regular rate of pay includes many different kinds of remuneration, for example:  hourly

2  earnings, salary, [and] *piecework earnings*")(emphasis supplied); 29 C.F.R. §778.111(a) (stating that,

3  "[w]hen an employee is employed on a piece-rate basis, the regular rate of pay is computed by adding

4  together total earnings for the workweek from piece rates and all other sources").

5      For the period of February 9, 2007 through March 24, 2013, Specialty's improperly failed to

6  compute the regular rate when determining the amount of overtime owing to its employees.  During the

7  relevant period, some employees have been short paid earned overtime, while others, such as part time

8  workers, had no overtime hours, at all.

9      *2.*    ***Specialty's Overtime Violations***

10      As set forth in the Complaint, Plaintiffs allege that Specialty's failed to provide proper overtime

11  to hourly employees.  (SAC ¶ 11.)  As detailed in the SAC, employees such as Chisholm were paid both

12  an hourly wage and a "delivery fee bonus."  (SAC ¶ 11.)  Since the magnitude of the "delivery fee

13  bonus" was a function of the number of "defects" reported by customers, the payments are a species of

14  piece rate payments, which must be included in determining one's regular rate for overtime purposes.

15      Plaintiffs' unpaid-overtime claim stems from the fact that Defendants' hourly-paid employees

16  also earned piece-rate "incentive" compensation tracking the amount of their work.  According to

17  Plaintiffs, whenever these employees worked in excess of eight hours per day or forty hours per week,

18  their overtime and double-time rates were calculated solely as a function of their hourly wages, not as an

19  additional function of their piece-rates.  The relevant, class-wide information has been provided to the

20  Claims Administrator, Claims have been filed and subjected to preliminary analysis, and this subclass

21  should be certified.  (Jan. 23, 2014 Wyatt Decl., ¶ 10.).

22      *3.*    ***Damages and Distribution of Settlement Funds***

23      The delivery incentive program that gives rise to the improper computation of the overtime claim

24  covers the entire period from February 1, 2007 to March 24, 2013.  During this period twenty-four

25  Specialty's stores collected at least $1,000 in delivery fees.  During this period, there were

26  approximately 68 Drivers from these twenty-four stores who worked at least one-half hour (.5) of

27  overtime during the relevant time period.  Similarly, there were approximately 765 non-driver

28  employees in the twenty-four stores who worked at least ten (10) hours of overtime during this period.

Based on a review of Specialty's records, it is estimated that, on average, Drivers were underpaid by approximately $20 for each overtime hour they worked, and, on average, non-driver employees were under paid approximately $1.50 for each overtime hour they worked. It was estimated that about $80,000 would be claimed by the subclass, which was the maximum allocated.  Analysis of the pay records indicated that the Overtime Subclass had 833 members.  Claims have been filed by 405 Class Members.  The claims thus far total $89,701.02 for unpaid overtime wages.  The projected cost for this part of the settlement is just marginally in excess of the cap amount for this subclass and pro rata distribution will come into effect.  (Sept. 10, 2013, Harris Decl. ¶ 28.)  The proposed resolution of this portion of the matter augurs in favor of approving the settlement.

### E.      Meal And Rest Period Violations[11]

#### 1.      The Law Regarding Meal and Rest Breaks

Plaintiffs' allege that Defendants failed to provide proper meal and rest breaks to California employees.  (SAC ¶¶ 17-18.)  In this regard, the relevant Industrial Welfare Commission ("IWC") wage order provides that "[n]o employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes."  8 Cal. Code Regs. § 11050 subsec. 11(A).  See also Cal. Lab. Code § 512(a) (stating that "[a]n employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes").  The relevant wage order also provides that "[e]very employer shall authorize and permit all employees to take [ten-minute] rest periods" for every four hours worked.  8 Cal. Code Regs. § 11050 subsec. 12(A).  Under the Labor Code, "[i]f an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the [IWC], the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period [wa]s not provided."  Cal. Lab. Code § 226.7(b).

#### 2.      Specialty's Meal and Rest Break Violations

Specialty's operated their California facilities with an inadequate number of employees.  As a result, Plaintiffs and other hourly-paid employees are alleged to have been pressured into working through their statutorily required breaks.  (SAC ¶¶ 17-18.)  They are therefore entitled to additional

---

[11] This subclass is discussed in detail in the September 10, 2013 Harris Decl., ¶¶ 30-39.

PLS.' MOT. FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEM. OF P'S. AND A'S. IN SUPP.

1  wages under section 226.7 of the California Labor Code.  The relevant, class-wide information has been

2  provided to the Claims Administrator, Claims have been filed and subjected to preliminary analysis, and

3  this subclass should be certified.  (Jan. 23, 2014 Wyatt Decl., ¶ 10.).

4                          **3.**       ***Damages and Distribution of Settlement Funds***

5        After distribution of the settlement fund to pay administrative costs, attorneys' fees and costs,

6  class representative incentive awards and payments to individuals in the "Bread Pull" subclass, the "Tip

7  Pool" subclass: the "Delivery" subclass, and the "Overtime" Class, it was estimated that there will

8  remain at least $914,000 for payment to employees who submit Meal and Rest Break claims. These

9  payments are on account of missed breaks.  Each employee will receive a pro-rata payment based on

10  number of workweeks he or she worked during the class period.  There were marginally more

11  workweeks at issue than originally estimated, a total of 181,489 actual workweeks rather than 173,000.

12  Again, since this is a discrepancy of less than 5%, the impact is not material, particularly in light of the

13  fact that additional funds will pour into the pool available for distribution to those in the Breaks Class.  It

14  was originally anticipated that claims for about half of the 173,000 estimate would be submitted:  claims

15  for roughly 86,500 workweeks.  Instead, the claims to date represent 92,027 workweeks.  Again,

16  however, the difference is marginal, particularly in light of the fact that we now anticipate substantial

17  "rollover" payments from the Subclass Funds for the Bread Pull Subclass, the Tip Pool Subclass, and the

18  Delivery Subclass.  Until the balance of the claims have been received and analyzed, it is too early to

19  present final, definitive numbers, but at this stage it appears that the projected $914,000 fund for the

20  Break Class will be increased to approximately $980,000.

21        Since we now believe that a projected fund of some $980,000 will be distributed to claimants

22  who worked for a total of approximately 92,027 workweeks, each workweek will have a "value" of over

23  $10.00 ($980,000/92027=$10.64). Initially, it was projected that a fund of $914,000 would be

24  distributed among Claimants representing some 86,400 workweeks, for a total of $10.56 per workweek

25  ($914,000/86,500=$10.56).  Accordingly, as with the original projections, one who worked for a year

26  will receive a payment of about $550 (now, $10.64*52=$553) and an employee who worked throughout

27  the entire class period should receive a payment of over $3,000.  (Sept. 10, 2013 Harris Decl., ¶¶ 31-32).

28

1          **F.     Derivative Wage and Hour Claims**

2          Plaintiffs also asserted three derivative class-wide claims stemming from Defendants' alleged

3   failure to pay proper overtime and provide proper breaks to California employees.  (See SAC ¶¶ 45-46.)

4   Since the defective wage statement violation and the violation arising from the failure to pay all wages

5   when the employee was fired, laid off or quit are by their nature penalties, under the authority of

6   Rodriguez v. West Publ'g Corp., 563 F.3d 948, 964 (9th Cir. 2009), it seems appropriate to discount

7   payments on account of these violations to zero, enabling the Net Settlement Fund to be distributed

8   entirely on account of unpaid wages.  (Sept. 10, 2013 Harris Decl., ¶¶ 94-95).

9          The first derivative, penalty claim is a wage statement claim under section 226 of the Labor

10  Code.  Section 226 requires employers to provide their employees with "accurate itemized statement[s]"

11  accompanying their paychecks, listing, *inter alia*, "gross wages earned," "net wages earned," "total

12  hours worked," and "all applicable hourly rates in effect during the pay period."  Cal. Lab. Code

13  § 226(a).  If "[a]n employee suffer[s] injury as a result of a knowing and intentional failure by an

14  employer" to provide such information, the employee "is entitled to recover the greater of all actual

15  damages" or a statutory damage award of up to $4,000.  Id. § 226(e).  Whenever Defendants' hourly-

16  paid employees earned piece rates and worked overtime during a pay period, their pay stubs failed to

17  properly itemize gross and net wages.  (SAC ¶¶ 45-46.)  Similarly, on any day that Defendants' hourly-

18  paid employees are alleged to have worked through a break, they should have received a "missed-break"

19  wage under section 226.7 of the Labor Code—a wage that should have appeared on their pay stubs.[12]

20  Plaintiffs contend that the alleged failure to list these wages on pay stubs entitles employees to the

21  damages set forth in section 226.  These are derivative wage statement claims which arguably do not

22  constitute violations at all.  E.g., White v. Starbucks Corp., 497 F.Supp.2d 1080, 1089-1090 (N.D. Cal.

23  2007); Rubin v. Wal-Mart Stores, Inc., 599 F.Supp.2d 1176, 1179 (N.D. Cal. 2009).

24

25

26  [12] It is uncertain whether premium wages earned on account of missed breaks give rise to possible
    exposure to continuing wage payments under section 203 of the California Labor Code.  See, e.g., Jones
27  v. Spherion Staffing, LLC, 2012 WL 3264081 *8 (C.D.Cal. August 7, 2012) ("the Court finds that
    Plaintiff cannot advance a claim for noncompliant wage statements pursuant to section 226(a) or failure
28  to pay wages due upon termination pursuant to section 203 based solely on alleged violations of section
    226.7").

1    Plaintiffs' second derivative penalty claim is for "continuing wages" under sections 201 through
2    203 of the Labor Code.  Section 201 states that, "[i]f an employer discharges an employee, the wages
3    earned and unpaid at the time of discharge are due and payable immediately." Cal. Lab. Code § 201(a).
4    Similarly, if an employee quits, "his or her wages shall become due and payable not later than 72 hours
5    thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in
6    which case the employee is entitled to his or her wages at the time of quitting." Id. § 202(a).  If an
7    employer "willfully fails to pay" former employees within the time limits set by sections 201 or 202,
8    whichever the case may be, then "the wages of the employee[s] shall continue as a penalty from the due
9    date thereof at the same rate until paid or until an action therefore is commenced," up to a maximum of
10   thirty days. Id. § 203(a).  Plaintiffs allege that they have not been paid all overtime wages as detailed
11   above, arguably entitling them to continuing wages under section 203.  (SAC ¶¶ 80-81.) Of course, the
12   defense argues that the overtime wages were paid correctly, and if there is a violation, it was a technical
13   one, a violation which should not give rise to continuing wages.

14       Plaintiffs' third derivative claim is for unfair competition under Business and Professions Code
15   section 17200 *et seq.*  (SAC ¶¶ 117-128.)  Section 17200 defines "unfair competition" as "any unlawful,
16   unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.  In effect, "[a]n action
17   based on this state statute 'borrows' violations of other laws when committed pursuant to business
18   activity." Harris v. Investors' Business Daily, Inc., 138 Cal. App. 4th 28, 32–33 (2006).  Because
19   unpaid wages are recoverable under section 17200 *et seq.*, see Cortez v. Purolator Air Filtration Prods.
20   Co., 23 Cal. 4th 163, 177–78 (2000), Plaintiffs may seek restitution of unpaid overtime and missed-
21   breaks wages for themselves and all similarly situated employees under the unfair-competition law
22   simultaneously with their claims under the Labor Code. See Cal. Bus. & Prof. Code § 17203 (stating
23   that a "court may make such orders . . . as may be necessary to restore to any person in interest any
24   money . . . which may have been acquired by means of such unfair competition.")

25       *G.    PAGA Claims*

26       Finally, as noted above, Plaintiffs' assert a PAGA civil-penalties claim under section 2698 *et*
27   *seq.* of the California Labor Code.  (SAC ¶¶ 130-132.)  PAGA permits "an aggrieved employee" to seek
28   civil penalties "on behalf of himself or herself and other current or former employees" for violations of

1    sections 201, 202, 226, 510, and 512 of the Labor Code, which penalties are to be split between the

2    aggrieved employees and the LWDA.  See Cal. Lab. Code § 2699(a), (i).  Under the plan of distribution,

3    in satisfaction of PAGA claim, the LWDA is the cy pres recipient in connection with this case.

4    Additionally, as set forth in paragraph 17(B)(1) of the Settlement Agreement, interest shall accrue in the

5    amount of 1% on the second installment payment of $970,000, commencing on November 16, 2013.

6    The interest will stop accruing at the time of payment of the second installment by Defendants.  On

7    November 15, 2015, the accrued interest on the second installment shall be paid to the State of

8    California Labor & Workforce Development Agency as a further PAGA payment.  This is a reasonable

9    result with respect to the PAGA claim.

10   ### IV.   Incentive Awards and Attorney's Fees

11          Under the terms of the Settlement Agreement, Class Counsel have applied for incentive awards

12   to Plaintiffs of $8,000, each, for their efforts in bringing, prosecuting, and settling this case.  (Nov. 22,

13   2013 Mo. for Award of Fees (ECF Doc. 185), 25:1-23.)  According to the Ninth Circuit, "[i]ncentive

14   awards are fairly typical in class action cases" and "are intended to compensate class representatives for

15   work done on behalf of [a] class, to make up for financial or reputational risk undertaken in bringing the

16   action, and, sometimes, to recognize their willingness to act as a private attorney general."  Rodriguez v.

17   West Publ'g Corp., 563 F.3d at 958–59 (emphasis removed), vacated on other grounds, 688 F.3d 645,

18   660 (9th Cir. 2012).  Courts should consider "'the risk to the class representative in commencing suit,

19   both financial and otherwise,'" as well as "'the amount of time and effort spent by the class

20   representative'" and "'the personal benefit (or lack thereof) enjoyed by the class as a result of the

21   litigation.'"  Smith v. CRST Van Expedited, Inc., 2013 U.S. Dist. LEXIS 6049 at *16 (S.D. Cal. filed

22   Jan. 14, 2013) (quoting Van Vranken v. Atl. Richfield Co., 901 F. Supp. 294, 299 (N.D. Cal. 1995)).

23          Here, all of the factors weigh in favor of approving the awards.  First, solely as a consequence of

24   the within action, Defendants (i) will pay $2,000,000 for the benefit of class members; and (ii) submit to

25   meaningful injunctive relief.  Second, two of the Plaintiffs have been deposed,[13] and all have expended

26   considerable time conferring with Class Counsel, providing factual background and support, analyzing

27   

28   _____

[13] Covillo and Henry were deposed.  Chisholm was not deposed, but he spent an extraordinary amount of time providing counsel with explanation of the substantial evidentiary record which he helped create. Covillo, Henry and Chisholm each attended full-day mediation sessions.

15

PLS.' MOT. FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEM. OF P'S. AND A'S. IN SUPP.

1    Defendants' provided data, and attending and participating in the initial two mediation sessions.  (Sept.

2    10, 2013, Harris Decl., Exs. 7-9.) Third, they "undertook the financial risk that, in the event of a

3    judgment in favor of Defendant[s] in this action, they could have been personally responsible for any

4    costs awarded in favor of Defendant[s]."  Vasquez v. Coast Valley Roofing, Inc., 266 F.R.D. 482, 491

5    (E.D. Cal. 2010).  Indeed, incentive awards are particularly appropriate in employment class actions,

6    where they help to alleviate the "stigma upon future employment opportunities for having initiated an

7    action against a former employer."  Campbell v. First Investors Corp., 2012 U.S. Dist. LEXIS 155549 at

8    *21–22 (S.D. Cal. filed Oct. 29, 2012).  Because the requested payments are *below* the range awarded in

9    similar cases, see Smith, 2013 U.S. Dist. LEXIS 6049 at *17–18 (noting that incentive awards range

10   from $25,000 to $50,000), they should be approved.

11           Pursuant to the terms of the Settlement Agreement, Class Counsel have applied for an award of

12   attorney's fees in an amount not to exceed $660,000, *i.e.*, 33% of the Gross Settlement Fund, as well as

13   reimbursement of costs not to exceed $50,000. (Nov. 22, 2013 Mo. for Award of Fees (ECF Doc. 185),

14   2:3-6.)   Here, the violations at issue implicate fee-shifting statutes, including sections 218.5 and 1194 of

15   the California Labor Code.  Since the lodestar exceeds $660,000, it is appropriate in this case to make an

16   upward adjustment from the typical 25% benchmark in awarding class action attorneys' fees.  Principles

17   of equity permit fees and costs to come from the fund as a whole, see, e.g., Boeing Co. v. Van Germet,

18   444 U.S. 472, 478 (1980) ("this Court has recognized consistently that a litigant or a lawyer who

19   recovers a common fund for the benefit of persons other than himself or his client is entitled to a

20   reasonable attorney's fee from the fund as a whole.  The common-fund doctrine reflects the traditional

21   practice in courts of equity, and it stands as a well-recognized exception to the general principle that

22   requires every litigant to bear his own attorney's fees.  The doctrine rests on the perception that persons

23   who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful

24   litigant's expense.  Jurisdiction over the fund involved in the litigation allows a court to prevent this

25   inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among

26   those benefited by the suit.").

27           Because an upward departure from the benchmark is justified when the lodestar significantly

28   exceeds the benchmark level of fees, see, e.g., Hopkins v. Stryker Sales Corp., 2013 WL 496358 at *3

1   (N.D. Cal. filed Feb. 6, 2013), a request for a 33% fee is reasonable.  This is particularly true in light of

2   the fact that Settlement Class members stand to receive substantial recoveries, even if 33% in fees is

3   awarded, see, e.g., Singer v. Becton Dickinson & Co., 2010 WL 2196104 at *8–9 (S.D. Cal. filed June

4   1, 2010), and because, comparably sized settlements exceed the 25% benchmark, see, e.g., Cicero v.

5   DirecTV, Inc., 2010 WL 2991486 at *6 (C.D. Cal. filed July 27, 2010).

6   **V.      Notice to the Class**

7          The Settlement Agreement required the appointment of a Settlement Administrator to deliver the

8   Class Notice and Claim Form to the Class,  (Sept. 10, 2013, Harris Decl. Ex. 1.), and this Court has

9   appointed Gilardi & Co., LLC to perform those functions.  Covillo v. Specialty's Cafe, 2013 WL

10  5781574 at n.5 (N.D. Cal. filed Oct. 25, 2013)("Covillo"). As confirmed in the January 23, 2014 Wyatt

11  Decl., the Notice advises Class Members of the following key points:

12      1.  If Specialty's records show they worked on a weekend and were paid for fewer than two

13          hours of work, they will recover additional wages to compensate them for two hours.

14      2.  If Specialty's records show they worked as non-management personnel during the period

15          from February 2007 through September 2008, they will recover additional wages of about

16          $.10 per hour to compensate them for a misallocation of tips to Team Leads.

17      3.  If Specialty's records show they worked as Delivery Drivers they may be entitled to

18          reimbursement of expenses for parking and gas charges if they can submit adequate proof to

19          the Settlement Administrator, who will review all such claims.

20      4.  If Specialty's records show they earned overtime payments during pay periods when they

21          also received payments on account of the distribution of delivery fees, they will recover

22          additional wages of approximately $1.50 per hour for each hour of overtime they worked as

23          non-driver employees and $20.00 per hour for each hour of overtime they worked as Drivers.

24      5.  To the extent they worked for Specialty's during the period from February of 2007 through

25          October 25, 2013, they will receive additional payments of at least $5.28 per week on

26          account of missed rest and meal breaks.

27         Again, the fees and costs associated with claims administration will be paid from the Gross

28  Settlement Fund.  The parties presently anticipate that such claims administration fees and costs will not

PLS.' MOT. FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEM. OF P'S. AND A'S. IN SUPP.

1    exceed $45,000. (Jan. 23, 2014, Wyatt Decl., ¶13).  Plaintiffs' counsel's costs will not exceed $50,000.

2    As we have demonstrated, above, based on these estimates, deducting claims-administration fees and

3    costs from the Gross Settlement Fund will still enable Class Members to be paid substantially 100% of

4    their claims in connection with the Bread Pull, Tip Pool, Delivery and Overtime Subclasses, and still

5    provide quite significant payments to all employees for the Meal and Rest Break subclass.

6            The Class Notice as delivered to Class Members included the information required by Rule 23 of

7    the Federal Rules of Civil Procedure.  Specifically, the Class Notice described the nature of the action,

8    the definition of the Class, and the class-wide claims; it explained that Class Members may enter an

9    appearance through an attorney and that the Court will exclude those Members requesting exclusion;

10   and it specified the time requirements and manner of requesting exclusion, as well as the binding effect

11   of a class-wide judgment.  (Fed. R. Civ. Proc. 23(c)(2)(B) (stating that "[t]he notice must clearly and

12   concisely state in plain, easily understood language:  (i) the nature of the action; (ii) the definition of the

13   class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an

14   appearance through an attorney if the member so desires; (v) that the court will exclude from the class

15   any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the

16   binding effect of a class judgment on members under Rule 23(c)(3)").)  Although Rule 23 does not

17   require notices to inform class members of their objection rights, see Int'l Union v. Gen. Motors Corp.,

18   497 F.3d 615, 630 (6th Cir. 2007), the Class Notice explained that Class Members may object. (Sept. 10,

19   2013, Harris Decl. Ex. 6.)  Furthermore, (i) the Class Notice indicated the time and place of the hearing

20   to consider final approval of the Settlement Agreement, (ii) it displayed the address and telephone

21   number of Class Counsel and the procedure for making inquiries, and (iii) it provided information

22   regarding the proposed fees to be paid to Class Counsel and incentive awards to be paid to the named

23   Plaintiffs.  (Sept. 10, 2013, Harris Decl. Ex. 6.)  See William W Schwarzer, et al., California Practice

24   Guide: Federal Civil Procedure Before Trial ¶ 10:824 (The Rutter Group 2012) (specifying the content

25   of settlement notice).  In addition, the Class Notice explained the procedures for allocating the

26   Settlement Fund to Class Members.  (Sept. 10, 2013, Harris Decl. Ex. 6), and it directed employees to a

27   website that contained even more detailed information, including the operative SAC and all papers filed

28   in connection with the Motion for Preliminary Approval.

1    The Settlement Administrator delivered the Class Notice, along with the Claim Form, to Class

2    Members via first-class mail within ten days after receiving address information from Defendants.[14]

3    Class Members had sixty days from the date of mailing to submit completed Claim Forms and requests

4    for exclusion.  Pursuant to the terms of the Settlement Agreement, all objections to the Settlement must

5    be served and filed at least 16 court days before the Final Approval Hearing, that is, on or before

6    February 3, 2014.

7    ## VI.   Release Provisions and Opting Out

8            If the Court grants final approval of the Settlement Agreement, then, in exchange for the

9    consideration described above, Class Members will be deemed to have released Defendants from those

10   claims that were or could have been asserted in the SAC.  (Sept. 10, 2013, Harris Decl. Ex. 1, ¶ 14.)  If a

11   Class Member opts out, then he or she will not release any claims that he or she may have.  Those class

12   members who opt in will be deemed to have extinguished their FLSA claims.  As set forth in the Notice,

13   to the extent a Class Member does not submit a Claim Form, he or she will not release the FLSA claim.

14   ## VII.   The Court Should Certify the Class and Approve the Settlement Agreement

15   ### A.   Class Certification is Warranted

16           There is authority to the effect that a pre-certification settlement is subject to a somewhat higher

17   level of scrutiny than one negotiated post-certification.  See, e.g., Dunleavy v. Nadler, 213 F.3d 454, 458

18   (9th Cir. 2000).  However, concerns about the rights of absent Class Members can be dispelled by the

19   Court's review of the Settlement Agreement and by Rule 23's procedural protections.[15]  Officers for

20   Justice v. Civil Serv. Comm., 688 F.2d 615, 624–25 (9th Cir. 1982), cert. denied, 459 U.S. 1217 (1983).

21   A trial court has wide discretion in certifying a class for settlement purposes and will be reversed "'only

22   upon a strong showing that [its] decision was a clear abuse of discretion.'"  Dunleavy, 213 F.3d at 461

23   (quoting Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1238 (9th Cir. 1998)).

24

25   [14] Defendants provided the Settlement Administrator with a list of the last-known names, addresses, and social-security numbers of Class Members within fourteen days of preliminary approval.

26   [15] Plaintiffs note that their collective-action claim under the FLSA is not necessarily subject to Rule 23. However, "[b]ecause the standards for certifying an FLSA class and evaluating the fairness of an FLSA

27   settlement are less stringent than those imposed by Rule 23," courts have found "the FLSA requisites satisfied by a showing that Rule 23 requirements have been met."  Khanna v. Inter-Con Sec. Sys., Inc.,

28   2012 U.S. Dist. LEXIS 137651 at *9 (E.D. Cal. filed Sept. 25, 2012).  Accordingly, the following analysis—both with respect to class certification and final approval—is made only under Rule 23.

1    Class actions are favored, and Rule 23 is to be given a broad, rather than a restrictive,

2    interpretation in favor of maintaining class actions.  Adames v. Mitsubishi Bank, Ltd., 133 F.R.D. 82, 88

3    (E.D.N.Y. 1989); Labbate-D'Alauro v. GC Servs. Ltd. P'ship, 168 F.R.D. 451, 454 (E.D.N.Y. 1996).

4    Rule 23 contains four certification requirements:  (i) The class must be so numerous "that joinder of all

5    members is impracticable," (ii) there must be "questions of law or fact common to the class," (iii) the

6    claims of the representative plaintiffs must be "typical of the claims of the class," and (iv) the class

7    representatives must show that they "will fairly and adequately protect the interests of the class."  Fed.

8    R. Civ. Proc. 23(a).

9        This Court should confirm its preliminary finding that the Rule 23 numerosity and

10   ascertainability requirements are met in this case.  Covillo, at * 6.  There are just over 3,600 Class

11   Members.  (Jan. 23, 2014, Wyatt Decl. ¶¶4-5.)

12       Likewise, this Court should confirm its finding that the Rule 23 commonality requirement is met.

13   Covillo, at * 6.  ("Here, the issues facing the class arise from common questions involving Specialty's

14   policies regarding the calculation and payment of wages, distribution of tips, reimbursement for delivery

15   expenses, and provision of timely and compliant meal and rest periods to its workers. This is sufficient

16   to satisfy the commonality requirement.").

17       Plaintiffs also meet the typicality requirement, and they are adequate Representative Plaintiffs.

18   The fact-pattern for Plaintiffs is similar, if not identical, to that for other Class Members.  Again, for

19   example, Plaintiffs and Class Members earned hourly wages and piece-rate compensation, and they

20   worked overtime, but their overtime rates were not computed with reference to their piece-rate pay.

21   Plaintiffs also have no conflicts of interest with the Class, as they share Class Members' likely desire to

22   receive all funds owed.  (See Sept. 10, 2013, Harris Decl., Exs. 7-9.) Additionally, Plaintiffs are

23   committed to pursuing the claims of the Class, and their motivation in pursuing this action has been to

24   seek reimbursement for the Class and themselves, and to ensure that Defendants comply with wage-and-

25   hour requirements.  (See January 23, 2014, Covillo, Henry and Chisholm Decls.).

26       In addition, this Court has found that the Rule 23 typicality and adequacy requirements have

27   been fulfilled, and these findings should be confirmed.  Covillo, at * 6 ("Here, there is no indication that

28   there is any conflict between the class and Plaintiffs and/or their counsel. In addition, the court is

20

PLS.' MOT. FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEM. OF P'S. AND A'S. IN SUPP.

1  satisfied that Plaintiffs and their counsel have and will continue to pursue this action vigorously on

2  behalf of Plaintiffs and the proposed class members.").

3       In addition to the above-described four requirements, this case must also meet one of the non-

4  exclusive factors in Fed. R. Civ. Proc. 23(b).  This Court has made a preliminary finding "that

5  certification is appropriate under Rule 23(b)(3)" as "[q]uestions of law and fact common to class

6  members predominate over any questions affecting only individual member."  Covillo, at * 6.

7         ***B.***     ***The Settlement Meets the Requirements for Final Approval***

8       Rule 23 states that "[t]he claims . . . of a certified class may be settled . . . only with the Court's

9  approval."  Fed. R. Civ. Proc. 23(e).  As recently explained by the Central District, "[a] court must

10  engage in a two-step process to approve a proposed class action settlement."  McKenzie v. Fed. Express

11  Corp., 2012 WL 2930201 at *2 (C.D. Cal. filed July 2, 2012).  "First, the court must determine whether

12  the proposed settlement deserves preliminary approval."  Id.  If the court grants preliminary approval,

13  then, after class members have been given an opportunity to respond to the notice, "the [c]ourt must

14  determine whether final approval is warranted."  Id.  Final approval is warranted "only if the settlement

15  'is fundamentally fair, adequate, and reasonable.'"  Id. (quoting Torrisi v. Tucson Elec. Power Co., 8

16  F.3d 1370, 1375 (9th Cir. 1993)).

17       Here, the Court has already granted preliminary approval, the Class Notice has already been

18  mailed, and Class Members have been afforded an opportunity to respond.  The present inquiry

19  therefore focuses on whether the settlement is fair, adequate, and reasonable in light of the responses

20  received.  In this regard:

21         Circuit law teaches that the court must balance the following factors to determine

22        whether a class action settlement is fair, adequate, and reasonable:  (1) the strength of the

23        plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation;

24        (3) the risk of maintaining class action status throughout the trial; (4) the amount offered

25        in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6)

26        the experience and views of counsel; . . . and [(7)] the reaction of the class members to

27        the proposed settlement.

28  McKenzie, 2012 WL 2930201 at *3 (citing Torrisi, 8 F.3d at 1375).  Also relevant is whether "'the

1   settlement agreement was reached in arm's length negotiations,'" which "'create[s] a presumption that

2   the agreement is fair.'"  McKenzie, 2012 WL 2930201 at *3 (quoting Linney v. Cellular Alaska P'ship,

3   1997 WL 450064 at *5 (N.D. Cal. filed July 18, 1997)).  Here, each of these factors weighs in favor of

4   approval; Plaintiff's Motion should therefore be granted.

5                            *i.      Settlement Negotiations were Conducted at Arm's Length*

6            There is no doubt that the Settlement Agreement was reached through arm's length bargaining.

7   Again, the parties participated in three full-day private mediation sessions before experienced wage-and-

8   hour mediators.  That the Settlement Agreement is the result of a private mediation before an

9   experienced wage-and-hour mediator supports final approval.  See, e.g., Wren v. RGIS Inventory

10  Specialists, 2011 WL 1230826 at *14 (N.D. Cal. filed Apr. 1, 2011) (concluding that a settlement

11  agreement negotiated under a mediator's supervision "supports a finding that the parties reached the

12  settlement in a procedurally sound manner and that it was not the result of collusion or bad faith by the

13  parties or counsel").  As for the payments to be made to Class Members, the net dollar payments

14  represent significant relief, particularly given the problems in proof inherent in demonstrating that Class

15  Members were entitled to any recovery, at all.  E.g., Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th

16  1004, 1040 (2012) (holding that "[a]n employer's duty with respect to meal breaks under . . . section

17  512 . . . is an obligation to provide a meal period," which is satisfied if the employer "relieves its

18  employees of all duty, relinquishes control over their activities and permits them a reasonable

19  opportunity to take an uninterrupted 30-minute break," meaning that the employer is not liable for meal-

20  break violations if the employee voluntarily foregoes a break).  In light of many complicated issues, the

21  parties ultimately agreed to a $2,000,000 settlement.

22                           *ii.     Other Factors.*

23           According to the Ninth Circuit:

24           "Assessing a settlement proposal requires a district court to balance a number of factors:

25           the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of

26           further litigation; the risk of maintaining a class-action status throughout the trial; the

27           amount offered in the settlement; the extent of discovery completed and the stage of the

28           proceedings; the experience and views of counsel; . . . and the reaction of the class

1   members to the proposed settlement."

2   Dunleavy, 213 F.3d at 458 (quoting Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998))

3   (ellipses in original).  Certain factors may predominate in different contexts, and one factor may so

4   strongly predominate that it alone provides a sufficient ground for approval.  See Torrisi v. Tucson Elec.

5   Power Co., 8 F.3d 1370, 1376 (9th Cir. 1993).

6                           *a.*      ***The Strength of Plaintiffs' Case***

7         Although Plaintiffs consider their unpaid-overtime and other claims to be strong, no case is

8   certain of recovery. Significantly, under Brinker, Plaintiffs face a significant hurdle in demonstrating

9   that Class Members were required to work through their breaks instead of simply making the voluntary

10  decision to forego a break on any given workday.  Indeed, even if Plaintiff's meal-period and rest-break

11  claims were sustained through trial, the Central District has held that derivative claims for noncompliant

12  pay stubs and continuing wages cannot be based on violations of California's meal-period statute.  See

13  Jones v. Spherion Staffing LLC, 2012 WL 3264081 at *8–9 (C.D. Cal. filed Aug. 7, 2012).  Such factors

14  weigh in favor of approving the settlement.

15                          *b.*      ***The Likely Duration of Further Litigation***

16        In most cases, "'unless the settlement is clearly inadequate, its acceptance and approval are

17  preferable to lengthy and expensive litigation with uncertain results.'"  Nat'l Rural Telcomms. Coop. v.

18  DIRECTV, Inc., 221 F.R.D. 523, 526 (C.D. Cal. 2004) (quoting 4 Conte & Newberg, Newberg on Class

19  Actions § 11:50 (4th ed. 2002) (hereinafter "Newberg")).  Granting final approval of the Settlement

20  Agreement will permit create a Gross Settlement Fund that will pay Class Members approximately

21  100% of their damages related to Overtime, Bread Pull, Tip Pool and Delivery subclasses, and

22  substantial additional funds for Meal and Rest Break damages.  Because the putative Class has not yet

23  been certified and because notice has not been sent out, the likely duration of further litigation might

24  well be several years.  Accordingly, this factor also weighs in favor of approving the settlement.

25                          *c.*      ***The Risk of Maintaining Class-Action Status Through Trial***

26        Given the potential management issues noted with respect to Plaintiffs' breaks claim, "there is no

27  guarantee that th[e C]lass would not be decertified before or during trial."  Rodriguez v. West Publ'g

28  Corp., 2007 U.S. Dist. LEXIS 74767 at *29 (C.D. Cal. filed Sept. 10, 2007) (citing In re NASDAQ

1  Market-Makers Antitrust Litig., 187 F.R.D. 465, 476 (S.D.N.Y. 1998)), rev'd on other grounds, 563

2  F.3d 948 (9th Cir. 2009).  See also Rodriguez, 2007 U.S. Dist. LEXIS 74767 at *29 (stating that, "if

3  'insurmountable management problems were to develop at any point, class certification can be revisited

4  at any time under Fed. R. Civ. P. 23(c)(1)'") (quoting In re NASDAQ Market-Makers Antitrust Litig.,

5  187 F.R.D. at 476).  As recently explained by the Central District, there is often "no way of determining

6  on a classwide basis whether [missed breaks] were violations . . . or whether individual class members

7  voluntarily opted to start their meal break late, cut it short, or not take a break at all."  Ordonez v. Radio

8  Shack, Inc., 2013 U.S. Dist. LEXIS 7868 at *22 (C.D. Cal. filed Jan. 17, 2013).  This factor thus weighs

9  in favor of approving the settlement.

10              ***d.      The Settlement Amount Offered***

11         The Gross Settlement Payment is $2,000,000, which covers the anticipated payment of 100% of

12  many of the Class Members' claims and thousands more to long-term employees for missed breaks,

13  even after contemplated attorney's fees and costs, enhancement awards, claims-administration fees,

14  costs and payroll taxes are deducted.  This represents a more-than-reasonable resolution of this case.

15  (Sept. 10, 2013, Harris Decl. ¶ 77-85.)   See Rodriguez, 2007 U.S. Dist. LEXIS 74767 at *30 (noting

16  that a "settlement amount representing 33% of the maximum possible recovery was well within a

17  reasonable range when compared with recovery percentages in other class action settlements") (citing In

18  re Warfarin, 212 F.R.D. at 257–58).  Consequently, this factor weighs in favor of approval.  In addition,

19  the Settlement Agreement calls for additional, non-monetary relief that Plaintiffs would not have been

20  able to obtain by way of trial, given that they are former employees.  See, e.g., Helm v. Alderwoods

21  Group, Inc., 2011 WL 5573837 at *5 (N.D. Cal. filed Nov. 15, 2011) (holding that "[a] former employee

22  does not have standing to seek injunctive relief").  Because "this concession from [Defendant] exceeds

23  what Plaintiff[] could have obtained even if [she] had prevailed at trial," this factor weighs in favor of

24  approval.  Wren, 2011 WL 1230826 at *28.

25              ***e.      The Extent of Discovery and Stage of the Proceedings***

26         The extent of discovery also supports approval.  As noted above, Defendants' counsel responded

27  to extensive written discovery requests, producing more than 30,000 responsive documents. Six

28  depositions were concluded. Class Counsel executed the Settlement Agreement after having had the

1   opportunity to review both the formal discovery and informal discovery, "'enabl[ing them] . . . to act

2   intelligently'" in deciding to settle.  Rodriguez, 2007 U.S. Dist. LEXIS 74767 at *30 (quoting Newberg

3   § 11:41).  Furthermore, when the parties executed the Settlement Agreement, they had already engaged

4   in significant law-and-motion disputes as well as appellate practice, which further weighs in favor of

5   approving the settlement.  See Rodriguez, 2007 U.S. Dist. LEXIS 74767 at *31.

6   ### f.    The Experience and Views of Counsel

7       Class Counsel are experienced in prosecuting class actions, including wage-and-hour actions.

8   (See Sept. 10, 2013, Harris Decl. ¶ 87.)  Class Counsel is of the opinion that the Settlement Agreement

9   represents an excellent bargain for the Class, given the inherent risks, hazards, and expenses of carrying

10  the case through trial.  (See Jan. 23, 2014, Harris Decl. ¶6.)  This weighs strongly in favor of approval.

11  See Rodriguez, 2007 U.S. Dist. LEXIS 74767 at *32–33 (explaining that "the trial court is entitled to,

12  and should, rely upon the judgment of experienced counsel for the parties"; that, "[h]ere, [c]lass

13  [c]ounsel have considerable experience in litigating . . . class actions[] and other complex litigation";

14  and that "[t]his factor weighs in favor of approving the [s]ettlement").

15  ### g.    The Reaction of Class Members to the Proposed Settlement

16      The final reaction of Class Members to the Settlement Agreement cannot, of course, be known

17  until after the February 3, 2014 deadline for submission of objections. However, at this stage, with no

18  opt outs and no objections, the response of Class Members is a unanimous vote in favor of approval.

19  ### VIII.    Conclusion

20      Under the Settlement Agreement as amended, Class Members will receive substantially 100%

21  payment of their Bread Pull, Tip Pool, Delivery and Overtime claims and approximately $10 per

22  workweek for their break claims.  This represents an excellent result, one which warrants final approval.

23  Dated:  January 23, 2014                    Respectfully submitted,

24                                              HARRIS & RUBLE

25                                                  /s/ Alan Harris

26                                              Alan Harris
                                                Priya Mohan
27                                              Attorneys for Plaintiffs

28