United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NICOLA COVILLO, *et al.*,

        Plaintiffs,

        v.

SPECIALTYS CAFÉ, *et al.*,

        Defendants.

_____/

No. C-11-00594 DMR

**ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND GRANTING IN PART PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS, AND INCENTIVE AWARDS [DOCKET NOS. 185, 189]**

Plaintiffs Nicola Covillo, Troyreac Henry, and John Chisholm move for final approval of a class action settlement and for an award of attorneys' fees, costs, and class representative incentive awards. [Docket No. 185 (Pls.' Fee Mot.), 189 (Pls.' Mot. for Final Approval).] Defendants Specialty's Café and Bakery, Inc. and Craig Saxton do not oppose the motions. [Docket Nos. 187, 192.] The court conducted a Final Approval Hearing on February 27, 2014. For the following reasons, the court grants final approval of the settlement agreement and grants in part Plaintiffs' motion for attorneys' fees, costs, and incentive awards.

## I. Background

### A.    Litigation History

This is a wage and hour hybrid state law class action under Federal Rule of Civil Procedure 23 and federal law collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), brought on behalf of individuals who were employed as hourly workers by Defendants

**United States District Court**
For the Northern District of California

Specialty's Café and Bakery, Inc. ("Specialty's") and Craig Saxton, a founder and owner of Specialty's. Defendants operate approximately thirty quick service bakery-restaurants throughout California.[1] (2d Am. Compl. ¶¶ 5, 6.) Plaintiffs Nicola Covillo, Troyreac Henry, and John Chisholm worked for Specialty's as hourly employees in the positions of team lead, customer service associate, and delivery driver from July 2006 through July 2011. (2d Am. Compl. ¶¶ 4, 8-10.) Plaintiffs filed the instant putative class action on February 9, 2011, alleging violations of various provisions of the California Labor Code and California's Unfair Competition Law ("UCL"), Business and Professions Code section 17200 *et seq.*, and a claim for unlawful failure to pay wages in violation of the FLSA. (*See* Compl.)

In Plaintiffs' Second Amended Complaint, which is the operative complaint, Plaintiffs allege the following claims: 1) failure to pay minimum wage and overtime in violation of Labor Code[2] sections 510 and 1194; 2) failure to pay wages upon termination in violation of Labor Code section 203; 3) failure to provide accurate pay stubs in violation of Labor Code section 226; 4) failure to maintain accurate payroll time records in violation of Labor Code section 1174 and Wage Order 5; 5) failure to provide rest periods in violation of Labor Code section 226.7 and Wage Order 5; 6) failure to provide meal periods in violation of Labor Code sections 226.7 and 512 and Wage Order 5; 7) improper deductions from wages in violation of Labor Code section 221; 8) conversion; 9) failure to reimburse business expenses in violation of Labor Code sections 2802 and 2804; 10) failure to pay minimum wage and/or overtime compensation in violation of the FLSA, 29 U.S.C. § 216(b); 11) unfair business practices in violation of the UCL; and 12) a claim for civil penalties pursuant to the Private Attorneys General Act, Labor Code section 2699.3(a)(2)(C). (2d Am. Compl.)

On March 22, 2013, the parties agreed to settle this matter following three private mediation sessions and executed a settlement agreement on March 25, 2013. (Harris Decl., Sept. 10, 2013

---

[1] Specialty's also operates stores in Illinois and Washington. (2d Am. Compl. ¶ 5.) Current and former employees whom Specialty's employed in those states are not part of the putative class. (2d Am. Compl. ¶ 56.)

[2] All references herein to the "Labor Code" are to the California Labor Code.

United States District Court

For the Northern District of California

("Harris Decl. I"), ¶¶ 7, 48-50.)  The complete terms of the proposed settlement agreement are set forth in the Settlement Agreement and General Release ("Agreement") and the Amendment to the Agreement ("Amendment").  (Harris Decl. I Exs. 1, 2.)  The Agreement provides for a principal settlement class "comprised of all non-exempt employees who were employed by Specialty's within California from four years prior to the filing of the February 9, 2011 Complaint to the date of entry of preliminary approval of the Settlement Agreement [Oct. 25, 2013]."  (Agreement § 3.)  It also provides for five subclasses, described in further detail *infra*, as follows: Bread Pull subclass, Tip Pool subclass, Delivery subclass, Overtime subclass, and Meal and Rest Break subclass. (Amendment § 3.)

### B.    Terms of the Settlement Agreement

Under the terms of the settlement, Specialty's will pay a Gross Settlement Amount of $2,000,000 as a fixed common-fund settlement with no reversion.  The Gross Settlement Amount will be distributed among participating class members, Plaintiffs, the settlement administrator, and class counsel.  A portion of the amount will also be used to pay payroll taxes.  (Agreement § 7; Amendment § 7(D).)  Payments will be made to the class members, Plaintiffs, and class counsel in two distributions following two installment payments by Specialty's to the settlement administrator. Specialty's timely deposited the first installment payment of $1,030,000.  (Harris Decl., Jan. 23, 2014 ("Harris Decl. II"), ¶ 4.)  The parties anticipate that the first distribution will take place in April 2014.  The second distribution will take place in November or December 2014, following the second installment payment of $970,000 by Specialty's on November 15, 2014.  (Amendment §§ 7(D), 17(B).)  Payments to the Bread Pull, Tip Pool, Delivery, and Overtime subclass will be completed in the first distribution.  Payments to the Meal and Rest Break subclass will be made in each distribution, as will enhancement payments to the Plaintiffs and court-awarded attorneys' fees. (Amendment § 7(D).)

Unclaimed funds and any other residual from the Gross Settlement Amount, as well as interest in the amount of 1% on the second installment payment of $970,000 accruing as of November 16, 2013, will be paid into the Residual Net Settlement Fund, the balance of which will

1    be distributed to the California Labor and Workforce Development Agency as the *cy pres* recipient.

2    (Agreement §§ 12(E), 17(B).)

3            **1.    Bread Pull Subclass Allocation**

4            The proposed Bread Pull subclass addresses Plaintiffs' contention that Specialty's failed to

5    pay at least two hours of "reporting time pay" to workers who reported to work on weekends to

6    prepare for Monday morning baking.  *See* Cal. Code Regs. tit. 8 § 11050(5) (2013).  Members of

7    this subclass may receive up to two hours of pay if they worked a weekend without pay and

8    approximately one additional hour of pay if they were only paid for an hour of weekend work.

9    (Harris Decl. I ¶ 9.)  Plaintiffs computed the total possible damages for unpaid "Bread Pull" wages

10   to be approximately $55,000, and the parties allocated a total of $40,000 from the Gross Settlement

11   Amount to pay the claims of members of this subclass.  (Harris Decl. I ¶ 10.)  If less than the

12   $40,000 allocation is claimed, any remaining amounts will revert to the Meal and Rest Break

13   subclass.  (Harris Decl. I ¶ 11.)

14           **2.    Tip Pool Subclass Allocation**

15           The proposed Tip Pool subclass addresses Plaintiffs' contention that Specialty's failed to

16   properly allocate employee tips by improperly including "Team Lead" managers in tip pools from

17   February 2007 through September 2008.  (Harris Decl. I ¶ 12.)  Plaintiffs estimate the total possible

18   damages for improper allocation of tips is $50,000 and estimate that members of this subclass are

19   entitled to approximately $.10 for each hour they worked during the applicable period.  (Harris Decl.

20   I ¶¶ 13, 14.)  The parties have allocated a total of $35,000 of the Gross Settlement Amount to pay

21   claims for this subclass.  (Harris Decl. I ¶¶ 14, 15.)  If less than the $35,000 allocation is claimed,

22   any remaining amounts will revert to the Meal and Rest Break subclass.  (Harris Decl. I ¶ 16.)

23           **3.    Delivery Subclass Allocation**

24           The proposed Delivery subclass addresses Plaintiffs' contention that Specialty's did not

25   consistently reimburse delivery drivers for out-of-pocket business-related expenses associated with

26   delivering Specialty's food orders, including mileage reimbursement for employee-owned vehicles,

27   parking, and other miscellaneous expenses.  (Harris Decl. I ¶ 26.)  Plaintiffs estimate the total

28   possible damages for this subclass at approximately $130,000.  The parties have allocated a total of

**United States District Court**
For the Northern District of California

1   $70,000 to pay claims for the Delivery subclass.  (Harris Decl. I ¶¶ 27-29.)  If less than the $70,000

2   allocation is claimed, any remaining amounts will revert to the Meal and Rest Break subclass.

3   (Harris Decl. I ¶ 29.)

4       **4.**    **Overtime Subclass Allocation**

5       The proposed Overtime subclass addresses Plaintiffs' contention that from February 9, 2007

6   through March 24, 2013, Specialty's improperly computed overtime pay by omitting certain

7   payments from the regular rate of pay, thus using an artificially low regular rate.  (Harris Decl. I ¶¶

8   17-21.)  Specialty's's employees who work in stores that collect delivery fees are entitled to share in

9   the distribution of the fees according to a payout schedule.  Delivery drivers are entitled to share

10  75% of the delivery fees and the remainder is shared by the remaining employees in the store who

11  are entitled to receive tips.  (Harris Decl. I ¶ 17.)  Plaintiffs estimate that drivers were underpaid by

12  approximately $20 for each overtime hour that they worked, and non-driver employees were

13  underpaid by approximately $1.50 per overtime hour.  (Harris Decl. I ¶¶ 21, 22.)  Plaintiffs estimate

14  the total potential damages for all members of the subclass is approximately $140,000, and have

15  allocated $80,000 to pay claims for the Overtime subclass.  (Harris Decl. I ¶¶ 21-24.)  The

16  settlement administrator will determine the total overtime hours worked and each subclass

17  claimant's overtime payment, with drivers entitled to approximately $20 per overtime hour worked

18  and non-drivers entitled to approximately $1.50 per overtime hour worked.  (Harris Decl. I ¶¶ 21,

19  22, 25.)  If class members submit claims that exceed the funds allocated to this subclass, the

20  settlement administrator will impose a cap and make a pro rata distribution to class members based

21  upon the amount of overtime owed.  If less than the $80,000 allocation is claimed, any remaining

22  amounts will revert to the Meal and Rest Break subclass.  (Harris Decl. I ¶ 25.)

23      **5.**    **Meal and Rest Break Subclass Allocation**

24      Finally, Plaintiffs allege that Specialty's operated their California stores with too few

25  employees and thus pressured hourly workers to work through their statutorily-required meal and

26  rest breaks.  (2d Am. Compl. ¶¶ 17-18.)  The proposed Meal and Rest Break subclass addresses

27  these contentions, and consists of all non-exempt employees who were employed by Specialty's in

28  California from February 9, 2007 to the date of entry of preliminary approval of the Settlement

United States District Court

For the Northern District of California

1  Agreement (October 25, 2013), who worked more than one full workweek.  (Harris Decl. I ¶ 31.)

2  After distribution of the Gross Settlement Amount to pay administrative costs, payments to

3  individuals in the other four subclasses, attorneys' fees and costs, class representative incentive

4  awards, and payroll taxes, the balance will be distributed to the Meal and Rest Break subclass.

5  Plaintiffs estimate that there will be approximately $958,000 for distribution to this subclass based

6  on the number of weeks worked, and estimate that each subclass member will receive approximately

7  $9.30 per week for missed and/or late meal and rest breaks.  (*See* Pls.' Mot. 12; Wyatt Decl., Feb.

8  25, 2014 ("Wyatt Decl. II") ¶ 6.)  The parties will make payments from the Gross Settlement

9  Amount to the Meal and Rest Break subclass members in two distributions.  The first distribution

10  will take place in or around April 2014, with the balance distributed in November or December 2014

11  following the second installment payment of $970,000 by Specialty's on November 15, 2014.

12  (Amendment §§ 7(D), 17(B); Harris Decl. I ¶ 55.)

13  **6.  Remaining Terms**

14  The settlement agreement also provides for injunctive relief.  No later than 180 days

15  following final approval of the settlement, Specialty's will 1) provide refresher training to Store

16  General Managers to clarify that all breaks are permitted and authorized, and that employees receive

17  compensation for all hours worked; 2) confirm that it is routinely maintaining precise records of the

18  actual hours worked by its employees; and 3) utilize the correct regular rate when computing

19  overtime for its employees going forward.  (Agreement ¶ 8.)  Specialty's will bear the costs for the

20  injunctive relief and such costs will not reduce the Gross Settlement Amount.  (Harris Decl. I ¶¶ 56,

21  60.)

22  In addition, settlement administration costs, currently estimated at $45,000 (but not to exceed

23  $50,000) will be paid from the Gross Settlement Amount.  (Wyatt Decl., Jan. 23, 2014, ¶ 13; Wyatt

24  Decl. II ¶ 10; Agreement § 7(B).)  The Agreement authorizes class representatives Covillo, Henry,

25  and Chisholm to seek enhancement awards of up to $8,000, paid from the Gross Settlement Amount.

26  (Agreement § 7(C).)  Finally, the Agreement authorizes class counsel to apply to the court for an

27  award of attorneys' fees not to exceed 33% of the Gross Settlement Amount, or $666,000, as well as

28  reimbursement of litigation costs up to $50,000.  (Agreement § 7(A).)

United States District Court

For the Northern District of California

1    Specialty's agrees to make the payments and bear the costs for the injunctive relief described

2    above in exchange for the class members releasing all state and federal wage and hour claims that

3    relate to or arise from the facts alleged in the Second Amended Complaint up to and including

4    October 25, 2013 (the date of preliminary approval). (Agreement § 14.)  The release applies to each

5    class member who does not timely submit a request for exclusion.

6        **C.     Notice to the Class**

7    On October 25, 2013, the court granted Plaintiffs' motion for preliminary approval of the

8    settlement.  [Docket No. 184 (Prelim. Approval Order).]  Pursuant to the preliminary approval order,

9    Specialty's provided the settlement administrator with the class members' names and contact

10    information, as well as applicable employment information.  (Wyatt Decl. ¶ 3.)  The total number of

11    class members is 3,623.  (Wyatt Decl. ¶¶ 4, 5.)  The settlement administrator mailed the class notice

12    and claim form to the class members by November 22, 2013, with a claims filing postmark deadline

13    of January 21, 2014.  (Wyatt Decl. ¶¶ 4, 10.)  For those notices returned due to incorrect or

14    undeliverable addresses, the settlement administrator performed address searches and re-mailed the

15    notices to updated addresses and provided extended claims filing postmark deadlines.  (Wyatt Decl.

16    ¶¶ 6, 7.)  The extended claims filing postmark deadline is April 22, 2014.  (Wyatt Decl. II ¶ 5.)  As

17    of February 25, 2014, the settlement administrator has received 1,320 timely claim forms, for a

18    36.4% claims rate.[3]  (Wyatt Decl. II ¶ 5; Suppl. Harris Decl., Feb. 25, 2014, ¶ 3.)  In addition, as of

19    February 25, 2014, no class members have objected to or opted out of the settlement.  (Wyatt Decl.

20    II ¶¶ 8, 9.)

21        **II.  Class Certification**

22    For the reasons set forth in the court's preliminary approval order, the court finds that the

23    proposed settlement class meets the requirements of Federal Rules of Civil Procedure 23(a) and

24    23(b)(3).  The settlement class consists of "all non-exempt employees who were employed by

25

26    _____

    [3] The settlement administrator has received 34 "late" claims as of February 20, 2014, one month

27    after the January 21, 2014 claims filing deadline.  (Wyatt Decl. II, ¶ 7.)  According to counsel, these
include claims for which the postmarked date is illegible.  Consistent with counsel's recommendation,

28    the court orders the settlement administrator to accept late claims received through February 20, 2014.
(*See* Suppl. Harris Decl., Feb. 25, 2014, ¶ 5.)

1    Specialty's within California from four years prior to the filing of the February 9, 2011 Complaint to

2    the date of entry of preliminary approval of the Settlement Agreement [October 25, 2013]." (*See*

3    Prelim. Approval Order 10-12; Agreement § 3.)

### III.  Final Approval of Class Action Settlement

5        Federal Rule of Civil Procedure 23(e) provides that a class action may not be settled without

6    court approval.  "If the proposal would bind class members, the court may approve it only after a

7    hearing and on a finding that it is fair, reasonable, and adequate.  Fed. R. Civ. P. 23(e).  Approval

8    under Rule 23 involves a two-step process: (1) preliminary approval of the settlement; and (2) final

9    approval of the settlement at a fairness hearing following notice to the class.  *See Nat'l Rural*

10   *Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

11       The primary concern of Rule 23(e) is "the protection of those class members, including the

12   named plaintiffs, whose rights may not have been given due regard by the negotiating parties."

13   *Officers for Justice v. Civil Serv. Comm'n of the City & Cnty. of San Francisco,* 688 F.2d 615, 624

14   (9th Cir. 1982) (citations omitted).  To assess a proposed settlement, courts balance the following

15   non-exclusive factors: "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and

16   likely duration of further litigation; (3) the risk of maintaining class action status throughout the

17   trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the

18   proceedings; (6) the experience and views of counsel; (7) the presence of a governmental

19   participant; and (8) the reaction of class members to the proposed settlement."  *Churchill Village*

20   *LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).  Not all of these factors will apply to every

21   class action settlement, and in certain circumstances, "one factor alone may prove determinative in

22   finding sufficient grounds for court approval."  *Nat'l Rural Telecomm. Coop.*, 221 F.R.D. at 525-26

23   (citing *Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1376 (9th Cir. 1993)).  The district court's

24   role in evaluating a proposed settlement "must be limited to the extent necessary to reach a reasoned

25   judgment that the agreement is not the product of fraud or overreaching by, or collusion between,

26   the negotiating parties," and that the settlement is fair as a whole.  *Rodriguez v. West Publ'g Corp.,*

27   563 F.3d 948, 965 (9th Cir. 2009).  It is neither for the court to reach any ultimate conclusions

28   regarding the merits of the dispute, nor to second guess the settlement terms.  *Officers for Justice,*

United States District Court

For the Northern District of California

1   688 F.2d at 625; *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) ("Neither

2   the district court nor this court ha[s] the ability to delete, modify or substitute certain provisions. The

3   settlement must stand or fall in its entirety." (citation and internal quotation marks omitted)). "[T]he

4   decision to approve or reject a settlement is committed to the sound discretion of the trial judge

5   because [the judge] is exposed to the litigants and their strategies, positions, and proof." *Id.* (citation

6   and quotation marks omitted).

7        The court has evaluated the proposed settlement for overall fairness under the relevant

8   factors and concludes that settlement is appropriate.  With respect to the strength of Plaintiffs' case,

9   the parties reached settlement before the court considered the merits of their claims.  However, while

10  Plaintiffs believe that their claims are strong, they acknowledge that they face significant risks

11  should the case proceed through litigation.  In particular, Plaintiffs acknowledge the potential

12  difficulty in achieving and maintaining certification of a meal and rest break class or classes.  (*See*

13  Pls.' Mot. 23-24.)  There has been significant motion practice in this case, as well as appellate

14  practice, and it is indisputable that further litigation would be time-consuming and expensive for

15  both sides.  The proposed settlement provides meaningful relief to the class members as summarized

16  above, on a much shorter time frame than otherwise possible.  Based on the number of claims filed,

17  the average gross recovery under the settlement agreement is $1,477, with members of two of the

18  five subclasses (Bread Pull and Tip Pool subclasses) receiving full compensation for their claims.

19  (Suppl. Harris Decl. ¶ 5; Wyatt Decl. II ¶ 6.)  Class counsel estimates that the average daily wage for

20  class members is less than $100; therefore, the average gross recovery represents approximately

21  three weeks of pay per class member.  (Suppl. Harris Decl. ¶ 4.)  In addition, the proposed

22  settlement calls for injunctive relief that, as former employees, Plaintiffs would not have been able

23  to obtain had the litigation proceeded to trial.  *See, e.g.*, *Ramirez v. Manpower, Inc.*, No. 5:13-CV-

24  2880-EJD, 2014 WL 116531, at *7 (N.D. Cal. Jan. 10, 2014) (holding that former employees "lack[]

25  standing to seek prospective injunctive relief on behalf of a putative class containing both former

26  and current employees"; collecting cases).  The court finds that Plaintiffs negotiated substantial

27  monetary and injunctive relief for the class in light of the defenses and risks that counsel have

28  identified.

1   The extent of discovery and stage of the proceedings also support settlement.  The parties

2   reached the proposed settlement after more than three years of litigation, with significant discovery

3   completed, including over 30,000 documents produced and six individuals deposed.  Based on the

4   stage of the proceedings and the amount of investigation and formal discovery completed, the parties

5   had developed a sufficient factual record to evaluate their chances of success at trial and the

6   proposed settlement.  Further, the settlement is the product of good faith, non-collusive, arms-length

7   negotiations by experienced counsel after three mediation sessions, warranting a presumption in

8   favor of approval.  *See Officers for Justice*, 688 F.2d at 625.  Finally, the reaction of class members

9   to the proposed settlement strongly favors approval.  The class notice was sent to 3,623 class

10   members.  To date, the settlement administrator has received 1,354 claim forms, with no objections

11   and no class members opting out.  *See Mandujano v. Basic Vegetable Prods., Inc.*, 541 F.2d 832,

12   837 (9th Cir. 1976) (indicating that the number of objectors is "a factor to be considered when

13   approving a settlement").

14   In sum, the court finds that viewed as a whole, the proposed settlement is sufficiently "fair,

15   reasonable and adequate."  *See Officers for Justice*, 688 F.2d at 625.  Therefore, the court grants the

16   settlement final approval.

17   ## IV.  Attorneys' Fees and Costs

18   Rule 23(h) provides that "[i]n a certified class action, the court may award reasonable

19   attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed.

20   R. Civ. P. 23(h).  However, courts "have an independent obligation to ensure that the award, like the

21   settlement itself, is reasonable, even if the parties have already agreed to an amount."  *In re

22   Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011) (citations omitted).  Where,

23   as here, the settlement of a class action creates a common fund, the court has discretion to award

24   attorneys' fees using either the lodestar method or the percentage of the fund approach.  *Vizcaino v.

25   Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).  The percentage of the fund is the typical

26   method of calculating class fund fees.  *See id.* at 1050 (noting "the primary basis of the fee award

27   remains the percentage method").  The Ninth Circuit has established 25% of the common fund as the

28   "benchmark" for attorneys' fees, with 20-30% as the usual range.  *Id.* at 1047.  However, the

United States District Court

For the Northern District of California

1  "benchmark percentage  should be adjusted, or replaced by a lodestar calculation, when special

2  circumstances indicate that the percentage recovery would be either too small or too large in light of

3  the hours devoted to the case or other relevant factors." *Six Mexican Workers v. Ariz. Citrus*

4  *Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

5       Even when applying the percentage method, the court should use the lodestar method as a

6  cross-check to determine the fairness of the fee award. *Vizcaino*, 290 F.3d at 1050. "The lodestar

7  cross-check calculation need entail neither mathematical precision nor bean counting. . . . [courts]

8  may rely on summaries submitted by the attorneys and need not review actual billing records." *In re*

9  *Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005) (footnote and citation omitted).  The

10 court's selection of the benchmark or any other rate must be supported by findings that take into

11 account all of the circumstances of the case, including the result achieved, the risk involved in the

12 litigation, the skill required and quality of work by counsel, the contingent nature of the fee, awards

13 made in similar cases, and the lodestar cross-check. *Vizcaino*, 290 F.3d at 1048-50.

14      Plaintiffs request a fee award of $660,000, payable out of the gross settlement amount.  The

15 requested fee award amounts to 33% of the common fund, which exceeds the 25% benchmark the

16 Ninth Circuit considers presumptively reasonable. *See In re Bluetooth*, 654 F.3d at 942.

17      The court finds that class counsel has obtained substantial results in this case.  As noted, the

18 average gross recovery is $1,477, or approximately three weeks pay, with certain subclass members

19 receiving full payment for the estimated value of their claims.  The settlement also provides for

20 injunctive relief, which would not be available without settlement or the filing of a new lawsuit by a

21 current employee against Specialty's.  This litigation posed significant risks; Defendants vigorously

22 litigated this action from its inception.  Moreover, the case was conducted on an entirely contingent

23 fee basis, with class counsel assuming all of the financial risk of litigation.  At the final approval

24 hearing, class counsel noted that the financial risk was elevated due to a serious concern that

25 Specialty's, a privately-held company, would need to file for bankruptcy protection.  Class counsel

26 took a significant risk in investing in this case and was able to secure a meaningful result for the

27 class.  The court also finds that class counsel skillfully represented Plaintiffs and the putative class

28 in pursuing this action and successfully negotiating a settlement.

United States District Court

For the Northern District of California

1    In addition, class counsel's total lodestar is $1,018,684, based on approximately 1,750

2  attorney hours, which is substantially more than 33% of the common fund ($660,000).  (*See* Harris

3  Decl., Nov. 22, 2013 ("Harris Decl. III"); ¶ 7, Ex. 1; D. Harris Decl., Nov. 22, 2013, ¶ 4, Ex. 1; Rush

4  Decl., Nov. 22, 2013, ¶ 4, Ex. 1.)  Thus, the lodestar cross-check provides support for Plaintiffs'

5  request.  *See Vizcaino*, 2990 F.3d at 1050 ("Calculation of the lodestar, which measures the lawyers'

6  investment of time in the litigation, provides a check on the reasonableness of the percentage

7  award").  Plaintiffs' requested fee award is approximately 65% of the lodestar, which means that the

8  requested fee award results in a so-called negative multiplier, suggesting that the percentage of the

9  fund is reasonable and fair.  *See Pierce v. Rosetta Stone, Ltd.*, No. C 11-01283 SBA, 2013 WL

10  5402120, at *6 (N.D. Cal. Sept. 26, 2013).

11    Having reviewed these factors, the court finds that an upward departure from the 25%

12  benchmark is warranted in light of the substantial recovery obtained for the class members; the

13  quality of representation provided by class counsel; and the risk of litigation, particularly given the

14  possibility of Specialty's bankruptcy and the contingent nature of class counsel's fee arrangement.

15  However, the court finds that the 33% award sought by Plaintiffs is not warranted in this case.  As

16  noted, the "usual range" for fee awards when using the percentage method is 20-30%.  *Vizcaino*, 290

17  F.3d at 1047.  The court finds that Plaintiffs have failed to demonstrate any "special circumstances"

18  justifying a fee award equal to 33% of the common fund.  *See In re Bluetooth*, 654 F.3d at 942

19  ("courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award,

20  providing adequate explanation in the record of any 'special circumstances' justifying a departure").

21  Other than the commendable results achieved for the class members, there are no special

22  circumstances present which warrant such a significant departure from the benchmark.  Plaintiffs

23  cite two recent fee awards in this district in wage and hour cases to support their assertion that the

24  requested fees are within the range of approval, *Knight v. Red Door Salons, Inc.*, No. 08-01520 SC,

25  2009 WL 248367 (N.D. Cal. Feb. 2, 2009) and *Hopkins v. Stryker Sales Corp.*, No. 11-CV-02786-

26  LHK, 2013 WL 496358 (N.D. Cal. Feb. 6, 2013).  (Pls. Fee Mot. 16-17).  However, in each of those

27  cases the court awarded attorneys' fees equal to 30% of the common fund, not 33%, as Plaintiffs

28  request here.  *Knight*, 2009 WL 248367, at *5-7; *Hopkins*, 2013 WL 496358, at *5-6.  In fact, in

United States District Court

For the Northern District of California

1  *Hopkins*, class counsel requested an award of 33.3% of the common fund, which the court denied,

2  instead awarding fees equal to 30% of the common fund.  2013 WL 496358, at *6.  The *Hopkins*

3  court described the results achieved on behalf of the class as "remarkable," where class members

4  received an average gross recovery per class member of $44,000 and did not have to submit claim

5  forms to recover their share of the settlement.  *Id*. at *2.

6         For the reasons set forth above, the court finds that an award of 30% of the common fund is

7  appropriate and warranted here.  Accordingly, the court awards Plaintiffs attorneys' fees in the

8  amount of $600,000.

9         Class counsel is also entitled to reimbursement of reasonable expenses.  Fed. R. Civ. P.

10  23(h); *see Van Vranken v. Atl. Richfield Co.,* 901 F. Supp. 294, 299 (N.D. Cal. 1995) (approving

11  reasonable costs in class action settlement).  The Agreement permits class counsel to seek up to

12  $50,000 in litigation costs.  (Agreement § 7(A).)  Class counsel's incurred litigation expenses total

13  $53,338.31, and do not include expenses that will be incurred in the future.  (Harris Decl. III ¶ 13,

14  Ex. 1 at 121; D. Harris Decl., Ex. 1 at 50; Rush Decl., Ex. 1 at 77.)  Having reviewed the evidence

15  submitted in support of the request for expenses, the court finds the expenses were reasonably

16  incurred and awards class counsel $50,000.

17                        **V.  Class Representative Incentive Payments**

18         At its discretion, the court may award incentive or service awards to named plaintiffs to

19  compensate them for work done on behalf of the class and in consideration of the risk undertaken in

20  bringing the action.  *Rodriguez*, 563 F.3d at 958-59 (9th Cir. 2009).  Courts often assess the

21  reasonableness of the award by taking into consideration: "(1) the risk to the class representative in

22  commencing a suit, both financial and otherwise; (2) the notoriety and personal difficulties

23  encountered by the class representative; (3) the amount of time and effort spent by the class

24  representative; (4) the duration of the litigation; and (5) the personal benefit (or lack thereof)

25  enjoyed by the class representative as a result of the litigation."  *Van Vranken*, 901 F. Supp. at 299

26  (citations omitted).  In this district, a $5,000 incentive award is presumptively reasonable.  *See*

27  *Pierce*, 2013 WL 5402120, at *6 (citations omitted).

28

**United States District Court**
For the Northern District of California

1    //

2    //

3         Plaintiffs ask that the court award incentive awards to Plaintiffs Covillo, Henry, and

4   Chisholm in the amount of $8,000 each.  (Pls.' Fee Mot. 25.)  Plaintiffs assert that they each spent

5   considerable time assisting class counsel over the course of the three-year litigation of this case,

6   providing factual background and support, assisting in the analysis of documents and data, assisting

7   with discovery, and actively participating in mediation sessions.  (Covillo Decl., Nov. 15, 2013, ¶¶

8   4-6; Henry Decl., Nov. 15, 2013, ¶¶ 4-6; Chisholm Decl., Nov. 22, 2013, ¶¶ 3, 4, 7, 8.)  Covillo and

9   Henry were each deposed and estimate that they each spent approximately 40 hours assisting class

10   counsel in prosecuting this case.  (Covillo Decl. ¶ 5; Henry Decl. ¶ 5.)  Chisholm did not provide an

11   estimate of the total hours he spent on this case, but describes the activities he undertook on behalf

12   of the class, including researching and reviewing applicable laws and cases.  (Chisholm Decl. ¶¶ 3,

13   4.)  In addition to the work they performed on behalf of class members, Plaintiffs undertook a

14   financial risk that, in the event of a judgment in favor of Defendants, they may have been personally

15   responsible for any costs awarded to Defendants.  *See Pierce*, 2013 WL 5402120, at *7.  Further,

16   Plaintiff Chisholm states that he feels that an increased incentive award is warranted "in light of the

17   backlash [he] may experience in the future from potential employers on account of the very public

18   stance [he] took against Specialty's in this case."  (Chisholm Decl. ¶ 7.)

19         Having reviewed the declarations submitted in support of this request, the court finds that

20   incentive awards of $8,000 for each named plaintiff are reasonable in light of the time and effort

21   Plaintiffs expended for the benefit of the class and the risks associated with initiating the litigation

22   and representing the class.  Further, the incentive awards are particularly appropriate in this wage

23   and hour class action, where Plaintiffs undertook a significant "reputational risk" in bringing this

24   action against their former employer.  *See Rodriguez*, 563 F.3d at 958-59.

25                                   **VI.  Conclusion**

26         For the reasons stated above, the court approves the settlement in the total amount of

27   $2,000,000.  The court also awards Plaintiffs $600,000 in attorneys' fees, $50,000 in litigation costs,

28

and settlement administration costs not to exceed $50,000.  Finally, the court awards Plaintiffs
Covillo, Henry, and Chisholm each incentive awards of $8,000.


      IT IS SO ORDERED.


Dated: March 6, 2014



DONNA M. RYU
United States Magistrate Judge

Donna M. Ryu

**United States District Court**
For the Northern District of California

15